Dimitri L. Karapelou, Esquire
Law Offices of Dimitri L. Karapelou, LLC
212 W. Front Street, Suite 300
Media, PA 19063
(T): (215) 391 – 4312
(F): (215) 701 – 8707
dkarapelou@karapeloulaw.com
*Counsel for Defendant/Counterclaimant Johanna ML Francis*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JAMES M. FRANCIS**<br>1 Brown Street<br>Philadelphia, PA 19123<br><div align=right>***Plaintiff,***</div>**vs.**<br>**JOHANNA ML FRANCIS**<br>301 Washington Avenue<br>Brooklyn, NY 11205<br>***Defendant/Counterclaimant.*** | **CIVIL ACTION NO: 2:16-cv-04376-JHS** |

## <u>DEFENDANT'S SUPPLEMENTAL POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Defendant and Counterclaimant, Johanna Francis (hereinafter referred to as "Johanna") by and through her counsel, hereby files her Supplemental Post-Trial Findings of Fact [1]and Conclusions of Law and states[2]:

## I.     FINDINGS OF FACT[3]

---

[1] This supplements the post-trial findings of fact and conclusions of law filed on December 13, 2021 and referenced herein as Johanna FOFCL.

[2] This Submission is intended to respond to certain (not all) points raised by James in his FOFCL to correct any statements he made that are not an accurate reflection of the trial record. For anything not mentioned in this Submission, Johanna relies on her FOFCL, which is 115 pages long. For sake of brevity, this Submission will not repeat Johanna's FOFCL, unless absolutely necessary for context. Finally, the Court must not accept any statement in the James FOFCL that are not supported by a competent reference to the trial transcript or documents admitted into evidence. Further, James filed exhibits attached to this FOFCL. Many of these are documents that have missing pages or otherwise incomplete.

[3] James has attached to his FOFCL a number of exhibits marked from 1 through 41. These are the exhibit numbers assigned by the ECF System. They are not the exhibit numbers used at trial. For clarity, Johanna will reference both the exhibit number assigned by ECF and the trial exhibit number used by James, and which would have been marked at trial and be referenced as such in court transcripts.

**A.  Olde North Third Property.**

1.        On July 20, 2018, James commenced a lawsuit in the Philadelphia County Court of Common Pleas against LCP North Third LLC ("Common Pleas Court"), the entity that purchased the TD Bank Olde North Loan and foreclosed the property and took the property back at sheriff sale. D346 (bates 005374); Day 5, 34:22-25. (James)[4]

2.        The lawsuit remained active as of trial. Day 5, 35: 11-13. (James)

3.        James filed the lawsuit seeking to enforce an agreement containing an option (in favor of James as buyer) to purchase the Olde North Third property documented in a Memorandum of Option Agreement. D338; Day 5, 35-39. (James) James stated that if the lawsuit is successful, he would use the proceeds to pay back the Lutnick loans. Day 5, 39. (James)

4.        James testified that the option expired on February 17, 2019, but that there remain some residual rights in the option, the details of which James could not competently explain. Day 5; 45: 11-13. (James)

5.        James did not ask for Johanna's assistance during the option period, when the option was owned by Olde North Third LP. Day 5, 43:6-11. (James). James did not notify Johanna or other family members who own Francis Family Investments.

6.        James believes the lawsuit still has value and is pursuing it but has not included Johanna in the lawsuit. Day 5, 45: 18-24. (James)

7.        James' real intent with the option is to flip the option to an investor. Day 5, 47: 3-17. (James)

8.        James was not able to place a value on the option; however, to the extent that it exists, it would belong to Olde North Third LP, not James personally or Lutnick.

---

[4] Certain Findings of Fact from the original submission of Johanna Francis are restated herein to provide proper context and clarity.

9.      On December 7, 2021, the Common Pleas Court entered a final judgment and verdict in favor of James and against defendants in the amount of $966,126.00 ("James v. LCP Judgment") D346.[5]

10.     On December 10, 2021, the Common Pleas Court issued an Opinion supporting the James v. LCP Judgment. D346

11.     On February 1, 2022, the Common Pleas Court entered a final order awarding James counsel fees in the amount of $229,482.56. D346.

12.     The James v. LCP Judgment is a partnership asset of Olde North Third.  James illegally took over the ONT Partnership and then negotiated a forbearance agreement with TD Bank.  Subsequently, TD Bank assigned its loans to LCP North Third. James leveraged his position as general partner of ONT to negotiate an option agreement with LCP North Third dated March 6, 2017 *while* Olde North Third was still the record owner of the property.  The James v. LCP Judgment is a partnership asset that James converted from[6] Olde North Third to his personal use in violation of the partnership agreements.

13.     We request an emergency injunction for the awarded funds so that James may not use any of them without further court order. Johanna's FOFCL requested a declaratory judgment awarding her immediate control of Olde North Third. Because James continues to subvert

---

[5] D346 is the Common Pleas Court case docket through the date when Johanna's exhibits were submitted for trial. At trial, James testified that the lawsuit was active and ongoing. Johanna FOFCL¶439.  This Court may take judicial notice of any events in the Common Pleas Court which have occurred since trial of this case and which appear on the continued docket of D346 in the Common Pleas Court.

[6] Also, it should be observed that these events in the Common Pleas Court occurred during the period of time when James had filed several motions requesting continuances of the deadlines for his FOFCL, alleging numerous reasons including poor mental and physical health, and appealing to the Court's sympathies to a pro se litigant.  In the Common Pleas Court action, James was not pro se, and did not ask for any deadline extensions. He steamed forward.

During this trial, James has repeatedly informed this Court that he has suffered from poor health for years.  In his letter to the Court requesting an extension of time for the FOFCL (ECF No. 199), James stated "I was placed in an induced coma… only my wife, her family and a few friends knew of the hospital stay. My attorney's recommended I not tell my daughter."   This is a clear violation of the operating agreements since he was incapacitated.

Johanna's rights, she asks that the award for declaratory judgment be immediately entered in the form of an injunction or other relief, before or in conjunction with any final decision that is to be rendered in this case.

**B. September 2004 Refinances of NY Properties.**

14.     On August 31, 2004, James sent an email to Attorney Steven Rabinowitz, in support of the anticipated refinances of the New York Properties, which states, in pertinent part: "…I advised Gumenick that the LLC documents gave Johanna the authority to enter into the transactions on behalf of the LLC's and he would not need consents from all the members of the LLC…"  It further states: "…Operating agreements were sent to the bank through the mortgage broker, Meridian Capital, the bank signed off on everything but apparently did not forward documents to Gumenick. I will send you and Gumenick copies of the relevant documents, overnight mail, together with copies of any other relevant documents that are requested today…." D48 (001508).[7] This was in response to Rabinowitz email dated August 30th, 2004 which states "Gumenick wants authorization from all members of the LLC's, so if you want me to prepare it I'll need to have a list of all members of the LLC with a copy of the operating agreement. (D47)

15.     James wants this Court to accept that Johanna committed unethical acts in 2002. The documents submitted by James undermine these assertions and reveal their mendacity. In his FOFCL he states that Johanna was not the owner of Etienne Estates LLC based upon the operating agreement. The formation documents and EIN for the company submitted as evidence (by James and Johanna) state that Johanna is the owner. D5 (000343 to 000347) Furthermore, D10 (000455

---

[7] This (together with the statements in Johanna FOFCL, ¶¶ 73-111) refutes the contentions in the Proposed Findings of Fact and Conclusions of Law filed by James Francis ("James FOFCL").  In that submission, James alleges, without support, that Johanna had no corporate authority under the operating agreements of Etienne Estates NY and Francis Family Investments LLC to proceed with the September 2004 NY Refinances.

to 000456) Assignment of membership Interest dated May 29th, 2002 and D10 (000457 to 000460) Assignment of Membership Interest of same date were all executed by James Francis.

16.     Additionally, James fails to acknowledge the value of Johanna working from 2000 to 2002 that she was not paid for which included, but was not limited to, turning the buildings around, dealing with the lenders (he failed to pay) and preventing foreclosures. The evidence of the true value was contained in the appraisals that were brought to trial, not the documents James used in these exhibits which illustrate a higher value based upon Johanna renting out and stabilizing the buildings.

17.      James is a master of misconstruing documents to his benefit to take advantage of his family specifically his 28-year-old daughter who was a new single mom and working three jobs to take care of her son and giving James her money so they would not lose the houses she loved.

**C.  Equity Structure of Companies and Partnerships**

18.     James FOFCL asserts a partnership arrangement with Johanna that is not supported by the trial testimony or numerous exhibits.  It also is incredulous.

19.     James asserts that Johanna transferred 41% of her interest in Etienne Estates NY in 2002 to Francis Family Investments LLC in exchange for James giving her a 49% interest in the Philadelphia projects (when in 2002 the Philadelphia projects did not exist). James also asserts that the transfer was recorded on December 1, 2003. This makes no sense for several reasons.

20.     Initially, it must be noted that Francis Family Investments LLC was incorporated in Delaware on March 17, 2003. See D13 (complete copy of formation documents recorded in the State of Delaware as certified by an officer of the state); D14 (copy of the documents issued to Blumberg Excelsor in order to create the formation which lists all family members).

21.     First, this alleged transfer was not recorded or documented as James alleges.

22.     Second, James does not explain how Johanna could agree to something in 2002 that is not effectuated until December 1, 2003.  Johanna does agree that she transferred 41% of her interest in Etienne Estates NY to Francis Family Investment on December 1, 2003; however, she does not agree that the purpose was for her to receive 49% in Philadelphia projects. Any transfers would have been to the benefit of all family members and not James since he was never a member of Francis Family Investments LLC per the operating agreement he created and signature pages he witnessed. D13 (000676 to 000678).

23.     James, from the beginning and continuing through today, has owned a minority interest in Francis Family Investments through a Delaware entity FF Investments LLC (this entity is not authorized to do business in NY or perhaps Philadelphia).  Moreover, she testified (and it is recounted in the Johanna FOFCL) that this 41% was transferred back to her as part of the September 2004 NY Refinances and remained in effect during the 2006 refinances all of which James participated in. Since 2004 with the formation of Etienne Estates on Greene LLC and Etienne Estates at Washington LLC, Etienne Estates LLC (NY) no longer held any interest in any properties.

24.     James cannot cherry pick certain transactions that are outdated and no longer legally effective.

25.     James may not ignore that he created and issued the executed operating agreement to the Francis Family attorney, the bank's attorney, and title company in connection with the transactions. The operating agreements submitted into evidence containing his handwriting on the upper right-hand side of the first page of the document.[8]

---

[8] James has a habit of going back in time to cherry pick certain contracts, court proceedings, or other events, and then replacing the event with his subjective view or interpretation, no matter how displaced from the truth it may be. Johanna's FOFCL accurately recites the flow of agreements over the course of the project developments as the agreements were negotiated, documented, and completed.

26.     More importantly, this alleged agreement that James conjures up in his FOFCL is not reflected anywhere in the trial record.

27.     Third, Johanna competently testified that she received a 49% interest in the Philadelphia Partnerships as a general and limited partner in consideration and on account of her contributions to the Partnerships which included, among others, financial (money invested), professional services (managing the projects through her companies), and usage of her credit and guarantee of all the loans (which included warrants of attorney for confessions of judgements).

28.     Fourth, James's statements concerning the contributions to the partnerships in NY is contradicted by his statements concerning Johanna and her contributions to Philadelphia.  James has asserted that he determined (on his own sometime after 2010) that Johanna's 49% interest in the Philadelphia partnerships had no value because she made no capital contributions to the partnerships.  James then went on to control and liquidate the Philadelphia Properties for his sole benefit.  For purposes of argument, accept this statement as true.  If it were accepted as true, the statement would not hold up because it is flatly contradicted by another statement of James that Johanna received 49% as a limited partner in Philadelphia on account of her contributing 41% of Etienne Estates NY back to Francis Family (the 41% would have had substantial value).

29.      It is impossible for James to assert that Johanna gave up 41% in NY, which has substantial value, to receive 49% in Philadelphia, which according to James, was worthless.  This makes no sense as Johanna would not give up one partnership interest that has value to receive another that has none. It also goes against the Philadelphia Property tax returns which illustrated that Johanna was due money on account of her services and cash advances well before James' purported removal of her as the general partner and filings that zeroed her out. Johanna also met with and wrote to both James and his attorney Louis Lipsky that she would not give up her interests.

It is possible that those meetings and the various emails Johanna sent to both James and Lipski including D266 and D267 were what precipitated Louis Lipski to request the opinion letter from MMWR (which violates Johanna's rights under the Partnership Agreements and other agreements). D278.

30.     It should also be noted that in those emails Johanna demanded to know what was going on with Philadelphia since she was receiving Sherriff sale notices from the City of Philadelphia for the Philadelphia Properties. Johanna's email dated April 16th, 2012 (D266) clearly states that she had asked what was going on with the municipal taxes since February. James responded that matters were being handled. Johanna also informed James that she owned the 51% interest in the companies. On April 17th, 2012 (D267) Johanna responded to Lipski demanding documents and disputing James' purported removal of her as the General Partner and their actions. The sequence of communications and actions was no accident. James, in response to Johanna's enquiries and probing of not only him but, his attorney, went ahead and sought to change the capital accounts (without authorization) to clean Johanna's and all other family members interests out from the Francis family Investment companies' assets. Lutnick further testified he did not and could not make any changes requested by James.

31.     When James' various assertions are viewed in their entirety -as a court of law would do in order to determine whether they are objectively true and accurate –the entire case falls apart as just a self-serving fantasy.  James unjustly enriched himself which was strictly prohibited by the various written agreements.

32.     This litigation brought by James has brought him lucrative opportunities at the expense and to the detriment and betrayal of his family.

33.     Finally, James sidesteps the actual partnership interest percentages in Philadelphia. Johanna prior to her purported removal as General Partner held a 1% interest as the General Partner through EE Realty GP LLC and a 48% interest in her Limited partner EE Realty LP LLC. Her holding a 49% interest as a limited and general partner is an undisputed fact.  The remaining 51% of the Philadelphia Properties is owned by Francis Family Investments LLC. Of this, Francis Family Investments LLC, Johanna owned 16.15% and her son, who was under 18 when the partnerships were formed, owned another 16.15% (among other family members who also collectively had a combined majority interest). Again, these interest percentages are not disputed by James. [9] .And as of 2016 upon the unfortunate death of Evelyn Francis, Johanna inherited both Evelyn Francis and Norbert Francis' combined interest of 32.3%. See Johanna FOFCL ¶ 126 (at footnote 17).

34.     Thus, Johanna always held a majority of ownership interests in the Philadelphia Properties through a combination of her general and limited partnership interest and her (and her son's) ownership interest in Francis Family Investments LLC.  This is further illustrated by the fact that no other family member nor Francis Family Investments were ever required to guarantee any of the loans.

35.     This was not (nor ever was) a 50/50 sharing agreement according to the Philadelphia Partnership agreements[10] and James did not use his capital to acquire what became a minority membership interest in Francis Family Investments LLC. The partnership agreements, limited liability company agreements, purchase documents, closing statements and financial records do not support James' contention that it was his money - and nothing else- that was used to launch Philadelphia projects. He was not the king that he touts himself to be.

---

[9] James does not dispute the existence of the interest percentages as stated in the agreements. However, he attempts to undermine them in other ways, as Johanna has explained in her FOFCL.
[10] The various limited partnership agreements, whose existence is not disputed by James, clearly spell out the partnership interests and profit rights in the Philadelphia Properties.

36.     The objective of the developments and partnership agreements clearly speak for themselves and were a vehicle to enrich all family members.

37.     Throughout this trial James has never offered a cancelled check or any other financial documents that could be traced to a check that illustrates that he contributed any capital or loans to the entities or properties for their respective carrying costs .[11] James's emails to MMWR clearly illustrate that contributions of property came from Johanna as evidenced in an email he wrote to MMWR where he stated in bold letters "Johanna not James is contributing the property" D23.

### D.     232 S. Third Street

38.     James in is FOFCL states that he contributed the funds to purchase the 232 South Third property whereas all funds came from Johanna and her company Piccoli Disegni Inc. as evidenced by settlement sheet, banks statements and cancelled checks which included check number 99 that repaid Phoenix for the contract down payment of $1,000. D28. James' FOFCL stated that he supplied the money to purchase the property which is without merit and illustrates that James suit against Johanna for quiet title was just a guise to further seek to torture and harm his own daughter.

### E.   Philadelphia Partnership Distributions

39.     As stated in Johanna FOFCL (and here), James has been liquidating Philadelphia Properties nd taking the proceeds as distributions to himself. This is contrary to the Philadelphia Partnership Agreements.

40.     According to TVD Partnership Agreement, James was not permitted to take proceeds before paying the advances of EE Realty GP, LLC (or other creditors) when James sold and otherwise

---

[11] Johanna by this Court's Order and her own expense brought everything to Philadelphia to be examined.

liquidated the TVD partnership assets.  See P129 (at 03435, 3443; specifically, section 12.2 winding up and 12.1 termination, dissolution and liquidation)

41.     This applies to all Partnership Agreements including Olde North Third and Queen's Mews.

### F.  Partnering Agreement

42.     Johanna's FOFCL adequately explains that the Partnering Agreement.  Johanna FOFCL ¶¶ 128-30. James may not circumvent those terms and conditions, no matter how hard he tries. Moreover, James breached this agreement, in numerous ways, and thus may not seek refuge under it.

43.     The Partnering Agreement P1 (0008), partnership documents and contribution agreement, P2 (00013) do not allow a forced sale by any party. Consequently, James breached these agreements in many ways including by liquidating TVD and Olde North Third and not repaying Johanna's advances as required by the various agreements.

### G.  Management of Philadelphia Properties

44.     Johanna's FOFCL establishes a detailed foundation to support her contention that she responsibly managed the Philadelphia Properties.

45.      James FOFCL alleges that Johanna mismanaged an interest rate swap with the Olde North Third TVD loan. This is incorrect and belies the loan history.

46.     James refinanced the Olde North Third TVD loan. The lender would not have refinanced and extended more loan advances (as it did), if there was an issue with the interest rate.

47.     Olde North Third was required to pay interest per the loan documents.  James's contentions in this case are not supported by any references to loan documents. Neither James nor Johanna could deviate from these loan documents.  Further, James could not accuse Johanna of

mismanaging a loan unless he cites to the loan documents and any proper loan default notices by TD Bank, which do not exist in this case.

48.     James ECF Exhibit 228, P221 (correspondence from Johanna to TD Bank) shows that Johanna was effectively communicating with TD Bank concerning the requisitions for the TD Bank loan.

49.     Finally, as shown in Johanna FOFCL, TD Bank representative testified in Court and stated that TD Bank was willing to work with Johanna or James. TD Bank, had there been a problem with Johanna managing the property, would have so notified her (they never did)[12]. Johanna FOFCL ¶¶ 414-423.

## II.     CONCLUSIONS OF LAW

### A.  James' Claims of Rescission are Barred Because it Was Not a Cause of Action in The Complaint and is Untimely.

50.     James' Complaint contains a cause of action, Count III, against Johanna arising from her alleged transfers of interests in the New York Properties in August 2004. See Complaint, ¶¶ 24-36.  This is pled as a claim for waste and mismanagement.

51.     James, for the first time, in his FOFCL, has asked for damages arising from an alleged rescission claim.

52.     James's Complaint does not contain any claim for rescission.

53.     Notably, James's attorney removed the count of fraudulent transfer during the trial stating they were only seeking a claim for waste and mismanagement.

54.     Johanna, in her FOFCL, adequately responded to the alleged claim of waste and mismanagement.

---

[12] A loan default, is not, by itself, an act of mismanaging a property. James Francis FOFCL seeks to have the Court rely on one page of the Requisition ECF Exhibit whereas the full requestion is D155 and does not illustrate mismanagement as claimed by James Francis.

55.     A claim for waste and mismanagement is materially different from a claim for rescission.   James, despite being pro se litigant, is not entitled to add a claim this late in the proceedings.   As such, the claim for rescission, brought the first time in James FOFCL, should be summarily denied and does not conform to the proof that was offered at trial.

56.     Were this Court to consider the claim of rescission as a version of James's claim for waste and mismanagement, it should be denied as untimely (along with the reasons stated in Johanna's FOFCL which addresses the factual and legal merits of the claim).

57.     James claims to have discovered the alleged fraud regarding the percentage interests of 301 Washington and 61 Greene Avenue in August 2004. See Johanna FOFCL ¶ 95. James testified that he went ahead with September 2004 NY Refinances because he thought Johanna would change the membership interests back to 51% to 49%.  Day 4 129:16-21 (James).

58.     Rescission is an equitable remedy which "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Lenel Sys. Int'l, Inc. v. Smith*, 106 A.D.3d 1536, 966 N.Y.S.2d 618 (2013).

59.      Generally, complaints for rescission are subject to the six- year statute of limitations covering those actions for which no limitation is specifically prescribed by law, which include equitable actions.   The six-year statute of limitations also specifically covers rescission actions based on mistake and fraud.   16 N.Y. Jur. 2d Cancellation of Instruments § 39; N.Y. C.P.L.R. 213 (McKinney); *Rubin v. Rubin*, 275 A.D.2d 404, 712 N.Y.S.2d 626 (2000).

60.     A cause of action alleging fraud is timely if it is commenced either within six years from the time of the fraud, or within two years from the time the fraud was discovered, or with reasonable diligence, could have been discovered, whichever is longer. *Prand Corp. v. Cty. of Suffolk*, 62 A.D.3d 681, 878 N.Y.S.2d 198, 200 (2009).  The two-year period begins to run when

the circumstances reasonably would suggest to the plaintiff that he or she may have been defrauded, so as to trigger a duty to inquire on his or her part. *Pericon v. Ruck*, 56 A.D.3d 635, 868 N.Y.S.2d 118, 120 (2008). Further, a cause of action based upon fraud accrues, for statute of limitations purposes, at the time the plaintiff "possesses knowledge of facts from which the fraud could have been discovered with reasonable diligence." *Oggioni v. Oggioni*, 46 A.D.3d 646, 848 N.Y.S.2d 245, 247 (2007).

61.     James's claims for rescission are barred because he claimed to have discovered them in August, 2004, as he admitted, and did not bring this lawsuit until 2016 which is 12 years later. Therefore, the claims should be denied as untimely.

**B.  301 Washington**

62.     In the chapter 11 bankruptcy of Etienne Estates at Washington, LLC, James alleges he filed a motion to challenge the confirmation of the plan of reorganization. See James FOFCL.

63.     James alleges that he voluntarily decided to withdraw the motion to challenge, according to James FOFCL. The bankruptcy was dismissed. ECF Exhibit 2, P294 (order dismissing chapter 11).

64.     As such, the confirmation of the plan stands as a binding and legally enforceable against James. Johanna FOFCL, facts: ¶509-571; conclusions of law: ¶20. [13]

65.     If James has any disputes which arose post-confirmation, James has informed the bankruptcy judge in the Etienne Estates at Washington LLC bankruptcy that he intends to pursue them in this lawsuit against Johanna, according to the FOFCL of James.

66.     From reviewing the Complaint of James (in this lawsuit), he has asserted certain causes of action against Johanna arising from the NY Properties. These are the only causes of action

---

[13] This Court can take judicial notice of the fact that the bankruptcy judge in New York entered an order voluntarily dismissing the case (by agreement of the parties). The order is also attached as an exhibit to James FOFCL.

before this Court and they have been adequately litigated through the pleadings, trial testimony, exhibits and post-trial submissions.

67.     There are no other claims (old or new) that James can now raise or litigate.  The dismissal of the Chapter 11 bankruptcy of Etienne Estates at Washington LLC does not trigger any new claims for James. James has the claims already brought in his Complaint, nothing more. [14]

68.     Johanna's FOFCL adequately proves that she is the 100% owner of Etienne Estates at Washington LLC by virtue of the confirmation of plan order. Johanna FOFCL, facts: ¶509-571; conclusions of law: ¶20.  The dismissal of the bankruptcy does not alter this binding order of confirmation, which has the legal effect of a final judgment regarding the percentage ownership interests in Etienne Estates at Washington LLC.

69.     In summary, James may not use this Court to attack binding orders of the New York bankruptcy court.[15]

**C.  61 Greene Avenue**

70.     James has alleged that Johanna has violated the terms of a court ordered stipulation in this lawsuit dated September 27, 2016 and docketed as ECF No. 7 ("September 2016 Stipulation").  This is not true. [16]

---

[14] This lawsuit is the end of the road.  James does not get another shot at bringing new or different claims simply because he decided to walk away from New York.  James has shown a penchant for overcomplicating court proceedings by filing multiple lawsuits and motions in various courts, at the same time. However, all paths for James end here because he has exhausted all his procedural maneuvers aimed at causing confusion and delay.

[15] The bankruptcy court in New York expressly stated **post confirmation (as opposed to pre-confirmation)** disputes because that court would have no power to undo the confirmation order or allow James to challenge it. Further, the New York bankruptcy court has limited jurisdiction over post-confirmation disputes. D340 (005315 at ¶ 11). Hence, James very recently resorted back to this Court. The only claims James has before this Court, for whatever they may be worth, are those stated in this Complaint.  James had no legal standing (or ability) to accomplish anything in the New York bankruptcy.

[16] James's allegations regarding this are stated in a confusing and incomplete manner. To the extent that James disputes the enforceability of this document, which, yet again, is another document that James approved and agreed to (through counsel), Johanna responds to them.

71.     On its face, it is apparent that the 2016 Stipulation was for the benefit of James who had submitted an answer and cross claims with substantially similar claims pending at the same time in both the New York complaint and this lawsuit and was forced to withdraw them in New York as it is legally impossible to maintain the same claims in two different legal forums at the same time.

72.     Johanna has asserted certain counterclaims in this lawsuit against James relating to her investments in the Philadelphia Properties. These are not claims arising from monies that may have been misappropriated from 61 Greene Avenue by James when he was attempting to illegally manage and control the New York Properties. James has informed this Court that Johanna has violated the September 2016 Stipulation but that is an incorrect allegation.

73.     As articulated in her FOFCL, Johanna refinanced the NY Properties and invested that money in Philadelphia and James entities received money and benefited directly from the various refinances, which has nothing to do with any claims Johanna brought against James in the State of New York (by way of separate complaint dated June 3, 2013, ECF Exhibit 12 (P205). That New York complaint asks for money damages relating to James's illegal taking of rents (and other funds) and a declaratory judgment that Johanna is a 90% owner of 61 Greene Avenue and details James Francis conduct. Johanna sought a declaration that she is the 90% owner because James illegally filed the bankruptcy in 2012. In any event, Johanna, as established in her FOFCL, is the 90% owner through her entity.

74.     The New York complaint was brought during a highly contentious time during Johanna's relationship with James. Johanna testified that in 2012 and 2013 James had taken actions in an attempt to hijack control of 61 Greene Avenue from her See Johanna FOFCL ¶ 458. After the

Bankruptcy was dismissed for cause due to James's improper stewardship, he filed counterclaims against Johanna in the New York complaint.

75.     As a response to James' actions in the 61 Greene Avenue bankruptcy and other legal forums, Johanna took certain actions to protect this property including eventually entering into a stipulation with the 61 Greene Avenue lender (so ordered by the court) on August 2, 2013 that states she is in control and the authorized representative for the property. See Johanna FOFCL ¶ 464; D308 (004726). [17]Since that time, Johanna has been consumed with having to use her time and resources fending off James, in this lawsuit, regarding his efforts to hijack 61 Greene Avenue – again, for the second time.  In addition, Johanna has been forced to defend other actions that James has brought against her or allowed others to take against her. [18]

76.     Fortunately, James never succeeded in his plans to take over 61 Greene Avenue. Johanna testified that James was unsuccessful in his efforts and that she has always been 90% owner

---

[17] Ironically, James is complaining that Johanna has been litigious, when, in fact, her legal actions have always been in response to James.  James, since 2010, has taken several illegal actions, including filing bankruptcies in New York without Johanna's knowledge or consent, forcing involuntary bankruptcy in New York, suing Johanna in Pennsylvania and New York, filing lawsuits or challenges to lender's loans in the Philadelphia Partnerships (the loans Johanna, not James, guaranteed).  All these lawsuits and bankruptcies required Johanna to defend not only her rights and interests but, her son's, brother's, and grandparents' interests which she in 2016 inherited.

Throughout the trial James has illustrated through his own writings that he has relentlessly used the judgements he caused against Johanna in Philadelphia and other states to leave her in financial trouble and defame her character. He was so desperate for control that he informed the bankruptcy judge in the Etienne Estates on Greene bankruptcy that Johanna had several judgments against her. ECF Exhibit 4, P 195 (004044-55).  These are the same judgments caused by James illegal actions in the Philadelphia Properties and included a judgement he held against her when he purchased the Note for Independent Mortgage with Lutnick's money.

James, for an unexplained reason, attaches as an exhibit a letter he wrote in response to a criminal investigation by the State of Connecticut against him pertaining to Evelyn Francis, mother of James.  ECF Exhibit 13, P 206.

[18] James, at trial in his cross-examination of Johanna, questioned her about a pending lawsuit in the State of New York brought by Pennoni Engineering against James and Johanna. Johanna testified on cross-examination that James's claims in that lawsuit have no relevance here other than to add more evidence of James's duplicitous legal tactics and mismanagement of projects and its professionals.  Johanna also testified that James improperly filed an involuntary bankruptcy petition against a partnership asset, the Arc Building, causing it to lose value and be liquated through the bankruptcy.  This resulted in less funds to her and her son's paternal grandfather who owned an 80% interest in that development and was originally his home that he owned free and clear prior to it becoming a development in which James became a 10% owner of the Limited Partnership.

of 61 Greene Avenue. <u>See</u> Johanna FOFCL ¶ 468.  However, that does not mean that she does not continue to suffer from the consequences of his actions.

77.     Consequently, Johanna is allowed to assert facts and issues surrounding 61 Greene Avenue in this lawsuit by way of answer, affirmative defense, and counterclaim.  The New York Complaint was filed as a prophylactic response to James attempting to take control of 61 Greene Avenue. This Court may take judicial notice that the New York Complaint is no longer active. Essentially, Johanna is asserting her claims and defenses against James in this forum.[19]

78.     The 2016 Stipulation does not act to release, waiver, or otherwise impair any of Johanna's existing defenses, claims, and rights in the present lawsuit. Exhibit ECF 12, P205

79.     Moreover, looking closer at James's allegations surrounding 61 Greene Avenue, they ring hollow. [20]

80.     First, the bankruptcy court dismissed the 61 Greene Avenue bankruptcy based upon James's lack of stewardship. Johanna FOFCL 460; D302. [21]

81.      Second, James's opposition of Johanna taking control during the bankruptcy was filed after James fired his own attorney as noted in the motion to dismiss or convert and ECF Exhibit 12 (P205).  ECF Exhibit 10, P200 (004164) (this bankruptcy court order states that James filed an objection on his own).

---

[19] James's allegations surrounding the 2016 Stipulation are another distraction from this Court getting to the merits of this dispute.

[20] James FOFCL is riddled with incongruences as illustrated in his exhibits where he seeks to combined separate court documents.

[21] James attempts to mine the 61 Greene Avenue bankruptcy for fodder against Johanna. James filed that case, and it was dismissed. Anything that occurred in the bankruptcy is the result of James's actions.  The various events in that bankruptcy have concluded and bear no relation to Johanna's ownership interests in 61 Greene Avenue.  The bankruptcy was dismissed before any plan was confirmed. This Submission is meant to clear up a few inconsistencies alleged by James.

82.     Third, James accuses his daughter, Johanna, of his misdeeds. However, James fails to advise the court that at the time that the foreclosure was commenced for 61 Greene Avenue, the arrearages for the property were nominal.

83.     Based upon James' actions, by the time Johanna regained control in 2013 the stipulated amount due the mortgage lender was $1,325,000, far in excess of the original loan of $1,100,000, the difference being fees tacked on as a result of James' actions. D308 (004175) (the stipulation reflects the increased amount).

84.      Fourth, James attaches as an exhibit a cash collateral order in the 61 Greene Avenue bankruptcy but has failed to account for the money he collected and used during that bankruptcy. James FOFCL ECF Exhibit 8, P 199.

85.      Fifth, James's FOFCL takes Johanna's Declaration in Opposition to Debtor's Motion for Rule 2004 Examination out of context. See ECF Exhibit 10, P203.  The $57,300 (which is footnoted) was rent owed by James just for the period the receiver was in place. James should have paid this rent so it could have been used to pay the mortgage lender. The footnote goes on to state "in fact, if my father pays the back rent, these funds, when combined with the money in the Debtor's operating account and the monies being held by the Received, are sufficient to cure the entire default and reinstate the mortgage."

86.     Sixth, James seeks to draw attention away from leases he signed to pay rent for his use and occupancy of 61 Greene Avenue, which was active during the alleged events in question surrounding ownership of this property.  ECF Exhibit 10, P203 (004288-4294) (series of leases of real property). During this tenancy of James, Johanna (through Portmorant Construction LLC) properly received money for cleaning, maintenance and repair of the property which is broken down and detailed in ECF Exhibit 6, P 197.

87.     Finally, Johanna has testified that she, at all times, maintained, cared for, and paid the expenses of 61 Greene Avenue, including the period of time James had hijacked it and filed a chapter 11 bankruptcy in New York (2012). Johanna FOFCL ¶¶ 451-470.

88.     Again, James has misconstrued more legal documents, repeating a pattern of behavior that is designed to tie Johanna up in vexatious litigation while he continues to pilfer partnership assets.

**D.  Francis Family Investments LLC**

89.     James's FOFCL misstates the clear provisions of Francis Family Investments operating agreement regarding the capital accounts and other financial terms.[22]

90.     Francis Family Investments was incorporated as a limited liability company in the State of Delaware on March 17, 2003 with Johanna ML Francis and FF Investments LLC as the initial members and the persons listed in Schedule 1 to the operating agreement: Evelyn M. Francis; Norbert Francis; Steffian Francis; and Etienne Francis-Venet. D13 (000677).

91.     James's contentions regarding the identity of the initial members and dates of formation are without merit. The formation documents are writings signed by the parties and speak for themselves. D13.  James may not alter these formation documents in the context of this lawsuit through oral testimony or subjective opinion.

92.     The Francis Family Investments operating agreement provides that "Capital Contributions" means the initial Gross Asset Value of the property plus money contributed by the Members to the Company pursuant to this Operating Agreement, and in the case of all the Members,

---

[22] Johanna's FOFCL contains adequate detail surrounding the facts and circumstances of the formation, capital accounts, operation and functions of Francis Family Investments.  This Submission is intended to highlight the contractual terms, on their face. The general ledgers and tax returns of the Philadelphia partnerships, companies and organizations also reflect the partners' capital based upon the appraised values, as well as the loans made by Johanna's entities prior to James's illegally taking over in 2010.

the aggregate of all such Capital Contributions." D13 (000632). There were no separate agreements, oral or written, concerning the requirements of capital contributions.

93.     The Francis Family Investments operating agreement provides that "The Interests of the Members in their Company constitute their personal property. No Member has any interest in any specific asset or property of the Company." D13 (000641). Consequently, James violated this provision by attempting to alter the capital accounts and otherwise impairing the rights of Johanna under this provision.

94.     The Francis Family Investments operating agreement provides that profits and losses shall be paid to the "…:Members Pro Rata in Proportion to Units Held." D13 (000654). It does not, as James alleges, provide that James must first get repaid, before other members. It also does not permit James to take money from TVD and Olde North Third and never repay Johanna so that she is overwhelmed in judgements, debts, and legal fees. There is no requirement to return members capital before profits are distributed. This provision allows for adjustments to capital accounts to bring them into balances that are pro rata in proportion to units held. This provision does not mean that James gets paid more than Johanna or other members or should take all the money from the properties as he did through a series of transactions he alone created and intentionally concealed. The term pro rata in proportion to units held is plainly written to ensure that capital accounts stay at levels similar to their original balances.

95.     In any event, as Johanna testified, and per the agreement itself, there was no requirement for members to contribute cash or property and they never did. Even James testified that no one bothered to maintain capital accounts (there was no need to)– so it would be impossible for James to adjust capital accounts that were not maintained and make changes without notifications to any of the members.

96.     Consequently, James's allegation that his capital account in Francis Family Investments is greater in value than Johanna's and that this gives him more advantageous legal rights than Johanna is without foundational support in the formation documents. It is also contrary to the plain written terms of the operating agreement.

### E. James's Illegal Removal of Johanna as General Partner of the Philadelphia Partnerships[23]

97.     The Olde North Third Partnership Agreement (all partnership agreements contain identical language) provides that: …"no General Partner shall Transfer all or any part of its Units in the Partnership as a General Partner, and any such Transfer in violation thereof shall be null and void…" P52 (01502).  See Section 11.1(a)(i).

98.     The Olde North Third Partnership Agreement further provides that any purported transfer of Units in the Partnership held by a General Partner in violation thereof ***shall be null and void and of no force or effect whatever..***  P52(01502). See Section 11.1(a)(ii).

99.     James illegally usurped control of the Philadelphia Partnerships on August 24, 2010. See Johanna's FOFCL.  James removed Johanna as general partner (EE Realty GP LLC) and converted the general partner, which she owned and controlled 100%, into a limited partner.

100.     This conversion by James was in clear violation of the limited partnership agreements as they prohibit a transfer of the EE Realty GP LLC general partner Units. James attempted to circumvent this provision but failed to so do.  The conversion of general partner units to limited partner units is, in essence, a transfer of those units from EE Realty GP LLC general partner to EE Realty GP LLC limited partner.

---

[23] James FOFCL ignores the events which occurred in August 2010, when James illegally removed Johanna as general partner through the alleged signature of Evelyn Francis.  Rather, James shifts attention to accusing Johanna of causing the loan default for Olde North Third. Johanna's FOFCL adequately details the events and circumstances surrounding Olde North Third in 2009 and 2010, when there was difficulty getting the project completed and paying TD Bank.

101.     Further, the partnership agreements allow Johanna to seek indemnification and her counsel fees incurred as a result of this violation. P52(01502). See Section 11.1(a)(iii). Consequently, she is seeking, in this lawsuit, a reimbursement of all counsel fees and costs she has incurred since August 24, 2010 arising from enforcing her rights under the limited partnership agreements.

**F.  Olde North Third**

102.     With respect to the James Francis v. LCP Judgment, Johanna requests an injunction for the awarded funds so that James may not use any of them without further court order. Johanna's FOFCL requests a declaratory judgment awarding her immediate control of Olde North Third. Because James continues to subvert Johanna's rights, she asks that the award for declaratory judgment be immediately entered in the form of an injunction or other relief, before or in conjunction with any final decision to be rendered in this case.

**G.  Judgments against Johanna**

103.     Additionally, we request a finding to absolve Johanna of any existing personal guarantee agreements she gave to lenders and others regarding the Philadelphia Partnerships that resulted in judgments against her.

104.     James's actions intentionally and maliciously caused judgements to be entered against Johanna on the personal guarantees. This intentional misconduct was done so James could receive personal benefits.  The Contribution Agreement requires James to contribute to Johana in the event of a default relating to loans and their guarantees.

105.      Subsequently, James undertook actions to deprive Johanna of her rights and ability to dispute and resolve the personal guarantees.  James altered the Philadelphia Partners agreements

(and others) and entered into numerous settlements and agreements with other parties (including TD Bank and Lutnick) without her knowledge or consent.

106.    James took action against Johanna personally and her entities to undermine her rights (and those of family members) and consequently the judgments on the personal guarantees should be vacated or discharged based upon the legal doctrine of strictissimi juri.

107.    "A guarantee is an agreement to pay a debt owed by another which creates a secondary liability and thus is collateral to the contractual obligation. The principal debtor is not a party to the guarantee and the guarantor is not a party to the principal obligation." *Shire Realty Corp. v. Schorr*, 55 A.D.2d 356 (N.Y. App. Div. 1977).

108.    In *Katz v. Leblang*, 243 App. Div. 421 (1st Dep't 1935), the court recognized that the defendants' obligation as guarantors under a lease agreement was *strictissimi juris*, and that any alteration in the contract, whether material or not, discharged the guarantor. In that case, the parties to a lease entered into a new lease "without the knowledge or consent of the [guarantor] for the unexpired term of the old one at a "reduced rental." The court held that "[u]nder the new arrangement the guaranteed contract was entirely done away with and a new contract of different terms and different obligations was in effect substituted therefore. Such change in the relation of the parties clearly relieves the [guarantors] of any further obligation."

109.    In *H.L. Realty, LLC v. Edwards*, 131 A.D.3d 573 (2d Dep't 2015), the plaintiff owner of a retail property brought an action against the tenant of the retail property for the nonpayment of rent in the district court. In that action, the plaintiff and tenant entered into a stipulation of settlement whereby the tenant agreed to the entry of a money judgment representing certain rent arrears as well as to the entry of a judgment of possession. The plaintiff then commenced this action against the appellants who personally guaranteed the tenant's obligations under the lease

24

but who were not parties to the district court action or the stipulation of settlement. The court, recognizing that the lease provided that the tenant shall also pay the owner liquidated damages, held that "[w]hile a guarantor maybe relieved of the guaranty where the original obligation is altered without his or her consent, contrary to the appellant's contention, the stipulation of settlement between the plaintiff and the [tenant in the prior action], did not vitiate either the [tenant's] obligation to pay liquidated damages or the appellant's guaranty of that obligation under the unconditional guaranty." Judge Hindis-Radix dissented from the majority opinion, arguing that the "landlord cannot seek damages under the original lease and the extension of the lease, since those obligations were altered by the stipulation of settlement. The alteration of those obligations, without the guarantor's knowledge or consent, terminated the guarantor's obligation as a matter of law…"

110.    James altered the underlying loan documents between the Philadelphia Partnerships and its lenders including TD Bank and Lutnick and entered into new agreements with TD Bank and Lutnick (and possibly others).  These alterations, without Johanna's knowledge, participation and consent, acted to release her from any existing personal guaranty agreements under the original loans.

**III.    CONCLUSION**

Wherefore, Johanna Francis respectfully requests a judgment in her favor and against James Francis on her Counterclaims and a judgment in her favor and against James Francis for all claims in his Complaint and any other relief the Court deems appropriate.

Respectfully Submitted,

*/s/ Dimitri L. Karapelou*
Dimitri Karapelou, Esq.
Law Offices of Dimitri L. Karapelou, LLC
212 W. Front Street, Suite 300
Media, PA 19063

**Date: February 24, 2022**