IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES M. FRANCIS,<br><br>                    Plaintiff,<br>     v.<br><br>JOHANNA ML FRANCIS,<br><br>                    Defendant. | CIVIL ACTION<br>NO. 16-4376 |

## OPINION

**Slomsky, J.**                                                    **April 18, 2023**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FINDINGS OF FACT ........................................................................................ 5

   A.   The New York Properties............................................................................ 5

      1. Background ............................................................................................ 5

      2. Properties ............................................................................................ 11

         a. 61 Greene Avenue............................................................................ 11

         b. 301 Washington Avenue .................................................................. 12

   B.   The Philadelphia Properties...................................................................... 12

      1. Background .......................................................................................... 12

      2. Properties ............................................................................................ 17

         a. 115 and 117 North Third Street ...................................................... 17

         b. 312 Monroe Street and 307 Pemberton Street ................................ 18

         c. Queen's Mews Properties ................................................................ 19

      i.  207 and 209 Monroe Street (Queen's Mews West) ........................... 19

     ii.  718, 720, 722 and 724 South 2nd Street (Queen's Mews South) .................... 20

  d. 232 S. 3rd Street .................................................................................. 22

 3. Management of the Philadelphia Properties ................................................ 24

   a. James[1] Fails to Complete Development
    of the Philadelphia Properties  ................................................................ 24

   b. James Takes Control of the Philadelphia Properties ............................... 26

   c. James's Transactions Regarding
    the TrisVanDivi Property ........................................................................ 28

     i.  October 2010 Transaction Regarding 312 Monroe Street ................................ 28

     ii.  2014 Deed-in-Lieu of Foreclosure Transaction
      Regarding 312 Monroe Street .............................................................. 30

   d. James's Transactions Regarding
    115 and 117 North Third Street ............................................................... 31

   e. James's Transactions Regarding the Queen's Mews West
    Properties at 207 and 209 Monroe Street, Philadelphia, Pennsylvania
    and the Queen's Mews South Properties at 718, 720, 722, and 724 South
    2nd Street, Philadelphia Pennsylvania .................................................... 32

**III.  CONCLUSIONS OF LAW** ................................................................................ 33

 **A.   James's Claims** ........................................................................................... 33

 1. James Has Not Proven by a Preponderance of the Evidence
   that He is Entitled to Equitable Relief ...................................................... 33

   a. Pennsylvania Law on Quiet Title ............................................................ 34

   b. James Has Not Proven by a Preponderance of the Evidence a Viable Claim
    to Ejectment Under Pennsylvania Rule of Civil Procedure 1061(b)(1) ................. 36

---

[1]   Because the parties have the same last name, they will be referred to by their first names.

       c. James Has Not Proven by a Preponderance of the Evidence a Viable Claim
          to Quiet Title Under Pennsylvania Rule of Civil Procedure 1061(b)(2).. .............. 38

   2. James Did Not Prove by a Preponderance of the Evidence
      that Johanna Breached the Partnering Agreement ....................................... 39

      a. James Has Proven by a Preponderance of the Evidence
         that a Contract Exists ..................................................................... 41

      b. James Has Not Proven by a Preponderance of the Evidence
         that Johanna Breached Her Contractual Obligations ............................... 41

   3. James Has Not Proven by a Preponderance of the Evidence
      that Johanna Comitted Waste and Mismanagement
      of the New York Properties or the Philadelphia Properties ........................ 48

      a. Waste and Mismanagement - New York Properties ............................... 48

      b. Waste and Mismanagement - Philadelphia Properties........................... 52

**B.** **Johanna's Counterclaims** ................................................................. 55

   1. Johanna Has Not Proven by a Preponderance of the Evidence
      that She is Entitled to Declaratory Judgment.............................................. 55

   2. Johanna Has Not Proven by a Preponderance of the Evidence
      that James Engaged in Waste or Mismanagement of Property or Assets.................. 58

   3. Johanna Has Not Proven by a Preponderance of the Evidence
      that James was Unjustly Enriched .............................................................. 60

   4. Johanna Has Not Proven by a Preponderance of the Evidence
      that James Tortiously Interfered with Johanna's Business Relations ......................... 63

   5. Johanna Has Not Proven by a Preponderance of the Evidence
      that James Converted Her Property ........................................................... 64

**IV. CONCLUSION** .................................................................................. 66

## I.    INTRODUCTION

This case arises from the deterioration of the personal and professional relationship between a father and daughter.  Beginning in or around 2002, Plaintiff James M. Francis ("James") and his daughter Johanna ML Francis ("Johanna")[2] did business together for the acquisition, financing, construction, and/or development of numerous properties in New York and Philadelphia.  To do so, they formed various business entities, typically as partnerships or limited liability companies.[3]  The entities were owned by James and Johanna either individually, jointly, or with other members of the Francis family.

In or about 2008, the relationship between James and Johanna began to falter.  Projects undertaken by them did not progress as intended and ultimately were never completed.  Eventually, the parties were unable to make payments on loans funding their ventures and, consequently, many of the properties they managed were lost in foreclosure or repossessed.  Further, Johanna, as the only guarantor on many of the loans, was left liable to creditors.

While the parties' projects deteriorated, so did their relationship.  James and Johanna began to dispute the interests each held in the entities created to acquire, manage, and develop the properties.  James also took steps to remove Johanna as general partner of the family's investment company.  By 2010, the father and daughter stopped working with each other and became adversaries in a series of lawsuits and legal challenges.[4]  This action is one of those lawsuits.

---

[2]    Because the parties have the same last name, they will be referred to by their first names.

[3]    Tracing the creation, ownership and transfers associated with the various entities having an interest in the properties has been a daunting task.

[4]    The majority of the properties involved in these ventures were lost.  All Philadelphia Properties, except for 232 S. 3rd Street, to be discussed infra, were lost.  (Doc. No. 148 at 135:20-25; 136:1-3; Doc. No. 149 at 7:6; 38:20-23; Doc. No. 149 at 37:10-11; 38:16-23; 39:11-17-25; 40:1-10; 74:12-15, 18; 151 at 43:7-9; Doc. No. 152 at 139:15-20; Doc. No. 153 at 14:24-

On May 20, 2016, James filed a Complaint (Doc. No. 2-2, Ex. A) in the Philadelphia Court of Common Pleas against Johanna, alleging a number of state claims relating to the parties' failed business ventures.  In the Complaint, James asserts five claims.[5]  Each remaining claim will be noted and a short description will follow that explains the relationship between the claim and the parties.

- **Count I**: Equitable Relief: Quiet Title to 232 S. 3rd Street[6]

  James seeks to quiet title to 232 S. 3rd Street, Philadelphia, Pennsylvania.  In 2004, Johanna purchased this property on her own.  The Partnering Agreement, a document executed by the parties to assist in their Philadelphia-based real estate ventures, provides that each party holds a 50% interest in 232 S. 3rd Street, which James seeks recognition of in Count I.

- **Count II**: Breach of Partnering Agreement

  James asserts that Johanna breached the Partnering Agreement.  Specifically, he alleges that she engaged in misconduct which resulted in the properties either being unreasonably encumbered or lost, and that she has not delivered financial statements, tax returns, and related financial information to James.

- **Count III**: Waste and Mismanagement – New York Properties

  James alleges that Johanna engaged in waste, mismanagement, and self-dealing regarding the New York Properties.  He asserts that she: (1) facilitated a transfer of ownership interests without James's approval; (2) created two entities, Etienne Estates at Washington LLC and Etienne Estates on Greene LLC to benefit herself; (3) defaulted on the properties' mortgages; (4) lived in one of the New York Properties without

---

25; 15:1; 47:25; 48:1-6, 20-23.)  Johanna still controls the New York Properties.  (Doc. No. 148 at 136:5-7.)

[5]   Count IV (Fraudulent Transfer of Business Interests), was withdrawn by James before trial. (See Doc. No. 136 at 2 n.2.)

[6]   In his Pretrial Memorandum, James stated "Plaintiff will not be pursuing a claim of quiet title at trial."  (See id. at 1 n.1.)  However, in his Proposed Findings of Fact and Conclusions of Law, he (1) describes this matter as having four components, one of which is the "property interest of 232 South 3rd Street in Philadelphia" and (2) requests "an award and jud[g]ment for use and occup[a]ncy of 232 S. 3rd Street . . . ."  (Doc. No. 201 at 7, 45.)  Given James's pro se status and the uncertainty as to whether he wishes to pursue the action for quiet title alleged in Count I, the Court will still address this claim.

paying rent; and (5) directed funds to herself.  Moreover, James claims that Johanna has not supplied him with financial statements, tax returns, and other financial documents for Etienne Estates at Washington LLC and Etienne Estates on Greene LLC.

- **Count V**: Waste and Mismanagement - Philadelphia Properties

  James asserts a second claim of waste and mismanagement, this time regarding the Philadelphia Properties.  He alleges that Johanna's actions led to the default on loans relating to multiple properties, which in turn led to lenders filing confessions of judgment.  James also claims that Johanna misappropriated funds.  Finally, he contends that Johanna did not provide him with financial statements, tax returns, and other financial documents.

(See Doc. No. 2-2, Ex. A ¶¶ 5-36, 43-53.)

On August 10, 2016, Johanna removed the case to this Court.[7]  (See Doc. No. 1.)  On October 31, 2016, Johanna filed an Answer to the Complaint, alleging counterclaims against James relating to the properties and their business arrangements.  (See Doc. No. 8.)  As was done above, each counterclaim will be noted and a short description of each one will follow.

- **Count I**: Declaratory Judgment

  Johanna seeks a declaratory judgment.  She asks the Court to declare that she was the manager of various entities formed by the parties and that James's attempts to oust her from management and his other alleged unauthorized actions are null, void, or voidable.

- **Count II**: Waste and Mismanagement of the Philadelphia Properties and Philadelphia Partnership Assets

  Johanna asserts a claim of waste and mismanagement.  She alleges that James: (1) excluded her from management; (2) has not shared the properties' benefits with her: (3) did not complete the development of certain projects; (4) obtained an additional loan without her approval; and (5) sold one property without her knowledge.

---

[7]   This Court has diversity of citizenship jurisdiction over this case under 28 U.S.C. § 1332. "Federal district courts are vested with original jurisdiction over civil actions where the matter in controversy exceeds the sum or value of $75,000 and is between 'citizens of different States.'"  McCann v. Newman Irrevocable Tr., 458 F.3d 281, 286 (3d Cir. 2006) (citing 28 U.S.C. § 1332(a)(1)).  Here, the amount in controversy exceeds $75,000.  (Doc. No. 1 ¶ 10.) Plaintiff James Francis and Defendant Johanna Francis are citizens of different states.  James is a citizen of the Commonwealth of Pennsylvania (id. ¶ 8), and Johanna is a citizen of the State of New York.  (Id. ¶ 9).

- **Count III**: Unjust Enrichment

  Johanna alleges that James received several benefits, all of which stemmed from unauthorized, self-interested, and fraudulent actions.  From them, she asserts that he was unjustly enriched.

- **Count IV**: Tortious Interference

  Johanna asserts a claim of tortious interference.  She argues that James's actions interfered with her business relationships with the parties' various entities by removing her as a manager, selling one of the properties without her authorization, and taking out an additional loan on one of the properties.

- **Count V**: Conversion

  Finally, Johanna alleges that James has repeatedly diverted funds from the projects for his own personal use and has kept the proceeds to the exclusion of Johanna.

(See Doc. No. 8 ¶¶ 86-116.)

The Court held a ten-day bench trial on James's claims and Johanna's counterclaims.  (See Doc. Nos. 147–53, 179, 181–82.)  Trial began in February 2020 but was not completed until October 2021 due to the COVID-19 pandemic.  While James had counsel representing him for a large part of this case, from September 2021 to the present he has been proceeding pro se, including on the last three days of trial.  (See Doc. Nos. 170, 173.) The following witnesses testified at trial: (1) Plaintiff James Francis; (2) Defendant Johanna Francis; (3) Kendall Jones, an employee of TD Bank, North America; and (4) Jerome Lutnick, an accountant who formerly performed work for the family companies.  In accordance with Federal Rule of Civil Procedure 52(a)(1), the Court's findings of fact and conclusions of law follow.[8]

---

[8]    Federal Rule of Civil Procedure 52(a)(1) provides:

> In General.  In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58.

4

## II.      FINDINGS OF FACT[9]

### A.      The New York Properties

#### 1.  Background

The New York Properties consist of two brownstones located at 301 Washington Avenue ("301 Washington") and 61 Greene Avenue ("61 Greene") in Brooklyn, New York.  (Doc. No. 147 at 64:15-25.)  In 2000, James owned the New York Properties.  (Id. at 67:15-25; 68:4-15; 76:17-23.)  Soon after, however, James experienced financial difficulties with them.  (Doc. No. 151 at 52:6-9, 16-20; 114:9-11;116:23-117:1.)  As a result, a lender initiated foreclosure proceedings and a court appointed receiver was assigned for the New York Properties.  (Doc. No. 151 at 49:15-24, 50:9-16; 51:2-8, 11-16; 52:21-25; 122:1-13; Def.'s Ex. 1.)

These actions prompted James to seek his daughter's assistance.[10]  (Doc. No. 151 at 53:14-54:24; Def.'s Ex. 2.)  Johanna agreed to oversee the New York Properties.  (Doc. No. 151 at 114:9-16.)  She "cleaned out all the buildings between 2000 and 2002, [as] there were a lot of people that weren't paying rent . . . ."  (Doc. No. 152 at 11:1-3.)

In 2002, Johanna desired to resolve the foreclosure and receivership proceedings.  (Doc. No. 152 at 17:23-18:5.)  To accomplish this goal, Johanna first created Etienne Estates LLC New York ("Etienne Estates NY").  (Doc. No. 151 at 116:2-3; 129:7-8.)  An operating agreement for

---

[9]    All findings of fact are made by a preponderance of the evidence.

[10]    At the time, Johanna resided at 301 Washington and paid rent.  (Doc. No. 151 at 55:2-3; 117:2-3, 10.)  For a time, James did not require her to make rent payments because she did not have the funds to make the payments.  (Id. at 113:7-10.)  When she began assisting James with the properties, he released her from making rent payments.  (Id. at 54:19-24.)  The Francis family, however, through Etienne Estates, an entity created by the parties, paid rent for their use of the properties.  (Id. at 133:11-17; Doc. No. 152 at 7:1-22.)  Johanna still resides at this property. (Doc. No. 151 at 108:8-9.)

Etienne Estates NY was executed on April 14, 2002.  (Doc. No. 147 at 71:11-15; Def.'s Ex. 10.)

Second, on April 24, 2002, the parties refinanced the New York Properties using Greene Funding

Associates.  (Doc. No. 147 at 70:2-7, 22; 148:19-22; 154:1-5, 19-20, 23-155:2; Doc. No. 148 at

5:20-25; Doc. No. 151 at 126:1-2; Pl.'s Ex. 9.)  Johanna paid the costs to refinance the debt.  (Doc.

No. 151 at 128:25-129:2.)  Further, she and James personally guaranteed the new loan.  (Doc. No.

152 at 26:18; 27:8-11.)  Subsequently, Etienne Estates NY became the owner of the New York

Properties.[11]  (Doc. No. 147 at 71:7-9; 72:17-20; Doc. No. 151 at 126:22-24; Doc. No. 152 at 23:9-

13.) Johanna eventually acquired a 90% ownership in Etienne Estates NY.  (Doc. No. 147 at 78:21-

23; 79:13-15; 80:23-81:2; 109:2-3; Doc. No. 152 at 23:11-25; 26:6-15; 27:19-28:5; Pl.'s Ex. 14;

Pl.'s Ex. 15.)  Francis Family Investments LLC ("Francis Family Investments") acquired a 10%

ownership of Etienne Estates NY.  (Doc. No. 147 at 81:5-10; 109:2-3.)

Etienne Estates NY opened checking accounts, an operating account, and a property

account to track rent and bills.  (Doc. No. 151 at 130:8-12; 131:14-25; Doc. No. 152 at 6:9-13.)

After the refinance occurred, transfers were made from Etienne Estates NY to James's companies;

these transfers were recorded in the general ledger.  (Doc. No. 152 at 21:11-22:15.)  To manage

the New York Properties' finances, the parties kept an account at HSBC Bank and later at Signature

Bank, employed Santa Bruzika[12] to reconcile bank statements, and used Quickbooks to "track rent

collection and property expenses."  (Doc. No. 152 at 9:5-9; 10:8-10; 11:13-19.)  Throughout their

---

[11]   Over time, Etienne Estates NY had different members, requiring several transfers of ownership
       interests.  (See, e.g., Doc. No. 147 at 70-85.)  These transactions need not be discussed.  More
       importantly, the ownership structure of Etienne Estates NY as it existed between Johanna and
       Francis Family Investments will serve as the starting point of the findings for this entity.

[12]   Santa Bruzika's title is unknown.  She assisted largely in an administrative capacity,
       maintaining the company's books.  (Doc. No. 147 at 131:8-11; Doc. No. 152 at 9:5-9.)

business relationship, James and Johanna had access to the books and records; Johanna often sent James updates and copies of documents that he requested.  (Doc. No. 148 at 123:6-17; 131:8-18; Doc. No. 150 at 15:6-9; 47:2-4; 66:15-67:4; 140:2-8; 147:1-7; Doc. No.152 at 9:9-11; 146:4-8; 176:22-24; 177:1-7, 11-23; 178:2-6; 186:1-10; Doc. No. 153 at 38:11-20 Def.'s Ex. 108.)[13]  James also testified that the parties stored records in Brooklyn, which he accessed.  (Doc. No. 147 at 112:19-113:4; Doc. No. 148 at 121:5-10.)

In November 2002, at Johanna's urging, the parties refinanced the New York Properties a second time to secure a loan with a better interest rate.  (Doc. No. 147 at 70:7-9; Doc. No. 152 at 29:20-22; 30:7-10.)  The transaction and disbursements were entered in Etienne Estates NY's general ledger.  (Doc. No. 152 at 38:15-22; Def.'s Ex. 6; Def.'s Ex. 7; and Def.'s Ex. 11.)  Johanna again was a guarantor and signed the loan documents.  (Doc. No. 151 at 128:12-17; Doc. No. 152 at 32:8-9, 14-15.)  James, however, was not a guarantor on the second loan nor did he sign the loan documents.  (Doc. No. 152 at 32:10-13.)

In 2003, James created Francis Family Investments LLC ("Francis Family Investments"), which was incorporated in Delaware.  (Doc. No. 147 at 77:15; Pl.'s Ex. 16.)  The original members were: (1) Johanna; (2) FF Investments LLC (James's company); (3) Evelyn Francis (Johanna's grandmother); (4) Norbert Francis (Johanna's grandfather); (5) Steffian C. Francis (Johanna's brother); and (6) Etienne Francis-Venet (Johanna's son).  (Doc. No. 147 at 77:15, 22-23; 93:8-25; 98:20-99:4.)    Johanna    was    designated    as    a    co-manager    of    this    entity; FF Investments LLC, an entity owned by James, was the other co-manager.  (Id. at 94:3-5, 7-13; Doc. No. 148 at 17:15-25; 18:1-3.)

---

[13]   As part of this lawsuit, "Johanna produced about 100 boxes of records which were brought to Philadelphia for James to review."  (Doc. No. 152 at 177:1-7.)

In December 2003, Johanna transferred a 41% interest in Etienne Estates NY to FF Investments, which thereafter contributed its interest to Francis Family Investments, leaving Francis Family Investments with a 51% interest in Etienne Estates NY. (Doc. No. 147 at 82:13-17; 83:12-21; 84:6-8; 85:8-24; 86:23-87:1, 16-19; 109:14-18; 110:13-15; Doc. No. 151 at 93:5-15; Pl.'s Ex. 17; Pl.'s Ex. 18; Pl.'s Ex. 19; Def.'s Ex. 61.) Johanna then transferred her remaining 49% to Etienne Estates LLC ("Etienne Estates DE"), a Delaware corporation solely owned by Johanna. (Doc. No. 147 at 88:3-5; 109:14-19; Doc. No. 150 at 89:2-5; 93:18-21; 94:6-8.)

The parties refinanced the New York Properties once again in 2004 to take cash out of the properties. (Doc. No. 147 at 149:17-19.) Before the 2004 refinance was executed, on August 5, 2004 the parties formed Etienne Estates at Washington LLC and Etienne Estates on Greene LLC. (Id. at 116:24-117-2, 17-25; 118:1-5; Pl.'s Ex. 27; Pl.'s Ex. 28; Pl.'s Ex. 29.) James knew that these companies were being formed and explained the purpose behind their creation. (Doc. No. 147 at 118:7-15; 120:4-23.) Originally, Etienne Estates DE owned 90% of Etienne Estates at Washington LLC and Francis Family Investments owned 10%. (Id. at 119:5-9; 122:21-24.) Presently, Etienne Estates DE is the sole owner of Etienne Estates at Washington LLC. (Doc. No. 153 at 47:17-20; 110:19-25; 111:1-9; 114:8-25; 115:1; Def.'s Ex. 340.) At all times, Etienne Estates DE has owned 90% of Etienne Estates on Greene LLC and Francis Family Investments has owned 10%. (Doc. No. 147 at 119:2-4; 8-9; 12-15; Doc. No. 153 at 44:22-25.) Etienne Estates at Washington LLC owns 301 Washington. (Doc. No. 147 at 119:20-22.) Etienne Estates on Greene LLC owns 61 Greene. (Doc. No. 147 at 119:17-19.)

To secure financing, Johanna and James worked with a loan broker, Brett Kaplan, who was employed by Meridian Capital Group, a mortgage broker. (Doc. No. 150 at 142:13-14; Doc. No. 151 at 90:8-9; Doc. No. 152 at 149:1-3; 152:23-153:1.) The proposed lender was Washington

Mutual.  (Doc. No. 152 at 153:2-3; Pl.'s Ex. 8.)  Washington Mutual required a 90/10% ownership structure as a condition of the loan.[14]  (Doc. No. 152 at 157:9-23.)  This structure was required because Johanna was the sole guarantor.  (Id.)  She testified that "if you do not own a certain percentage, they [banks] want everybody to put up their tax returns and my father did not want to do that. . . .  So as a guarantor, I always have to have more . . . nobody else could own more than 10 percent or [then] everybody has to guarantee it."  (Doc. No. 152 at 157:15-17, 19, 21-22.)  A 90/10% ownership structure was also chosen for tax purposes, which James recognized.  (Doc. No. 152 at 165:4-14; 166:5-22; Def.'s Ex. 52.)  Therefore, as part of the financing, Francis Family Investments' 41% interest in the New York Properties was transferred to Etienne Estates DE.  (Doc. No. 147 at 112:10-18; Doc. No. 150 at 94:25; 95:1-4; Pl.'s Ex. 24; Pl.'s Ex. 25.)  The interests in the New York Properties, therefore, now consisted of Etienne Estates DE owning 90% and Francis Family Investments owning 10% of Etienne Estates at Washington LLC and Etienne Estates on Greene LLC.  (Doc. No. 147 at 119:2-9; 12-15.)

James acknowledged that Johanna sent an email to Meridian Capital Group, which contained organizational charts for Etienne Estates at Washington LLC and Etienne Estates on Greene LLC that showed this 90/10% ownership structure.  (Doc. No. 150 at 100:17-25; 101:1-2; Def.'s Ex. 45.)  Johanna also forwarded this email to James.  (Doc. No. 150 at 100:13-16; Doc. No. 151 at 89:20-25; 90:1-16; Doc. No. 152 at 152:6-11; Def.'s Ex. 45.)  James later acknowledged that he was aware on August 31, 2004 that Johanna "was asserting a 90 percent, 10 percent ownership split."  (Doc. No. 150 at 109:19-22, 25; 123:20-22; 123:8-124:1.)  A week after Johanna sent the email, James contacted Johanna with operating agreements for Etienne Estates DE,

---

[14]   James acknowledged that the loan was financed on a 90/10 % basis.  (See Doc. No. 150 at 107:12-14.)

Etienne Estates at Washington LLC, and Etienne Estates on Greene LLC, which also referenced the 90/10% ownership structure.  (Doc. No. 152 at 149:13-23; 150:1-7, 14-17; Def.'s Ex. 39.)

James, along with the parties' attorney, Steven Rabinowitz, Esquire, created these operating agreements.  (Doc. No. 151 at 98:2-11; Doc. No. 152 at 149:19-20; 154:21-22; 129:4-6.)  James also "created the instruments of transfer."  (Doc. No. 152 at 155:10-12; 156:4-13; Pl.'s Ex. 25.)  Later, James sent an email to First Nationwide, the title company facilitating the closing.  (Doc. No. 150 at 135:19-136:7; Doc. No. 152 at 162:3-163:2; Def.'s Ex. 51.)  This email also noted the operating agreements which showed a 90/10% split.  (Doc. No. 150 at 135:19-136:7; Doc. No. 152 at 162:3-20, 25; 163:1-2; Def.'s Ex. 51.)  In 2012, Johanna contacted Steven Rabinowitz for a copy of the operating agreements, which showed the 90/10% ownership structure.  (Doc. No. 153 at 127:11-128:2; Def.'s Ex. 260.)

Tax returns prepared for Etienne Estates on Washington LLC and Etienne Estates on Greene LLC, by contrast, showed that Francis Family Investments owned 51% in each entity.  (Doc. No. 147 at 134:8-13; 137:12-16.)  Johanna confirmed the entry on the returns which reflected these percentages.  James prepared them and made the changes on his own.  (Doc. No. 152 at 150:18-151:16.)

The final refinancing of the New York Properties occurred in January 2006 (61 Greene) and September 2006 (301 Washington).  (Doc. No. 147 at 149:20; Doc. No. 152 at 176:5-8.)  Excess funds from the refinancing were used for the Philadelphia ventures.  (Doc. No. 150 at 81:9, 13-19; Doc. No. 152 at 176:5-18.)  The funds were disbursed, in part, to James's companies.  (Doc. No. 151 at 129:20; 130:16-131:6; 132:11-12.)  James acknowledged that he "had meetings with Johanna to determine what bills she was paying.  The only money that could come in from bills would have been the refinancings from Brooklyn."  (Doc. No. 150 at 146:22-25.)

The January 2006 refinance was made with Washington Mutual Bank, F.A. and resulted in a new mortgage being combined with the property's existing mortgage. (Doc. No. 148 at 6:24-25; 8:8-9.) The September 2006 refinance was made with First Central Savings Bank and resulted in a new mortgage being placed on the properties. (Doc. No. 152 at 176:5-8; Doc. No. 153 at 103:17-20, 23-25; 105:14-15.) All funds were accounted for. (Doc. No. 152 at 42:8-11; Doc. No. 152 at 176:19-24.)

### 2.  Properties

#### a.  61 Greene Avenue

Johanna, through Etienne Estates on Greene LLC, paid the mortgage on 61 Greene for about three years, from 2006 until 2009. (Doc. No. 153 at 35:5-11.) In 2009, the property fell into arrears; Johanna worked with the lender and began renovating the building. (Id. at 36:4-8.) At that time, James resided at the property and did not pay rent. (Id. at 36:10-12, 19-20.) The lender filed to foreclose on the property after receiving notice from James that Johanna did not own the property and that the current ownership percentages were incorrect. (Id. at 37:2-5, 16-25; 38:1-8.) Johanna attempted to enter into a forbearance agreement, but James contacted the lender and informed it that Johanna did not own the property, preventing this potential forbearance on foreclosure from occurring. (Id. at 37:12-25; 38:1-8; Def.'s Ex. 305.) A foreclosure ensued which Johanna defended and she reached an agreement with the lender. (Doc. No. 153 at 43:6-8, 24-25.) Presently, through Etienne Estates on Greene LLC, Johanna has been current on the loan. (Id. at 45:12-14.) By contrast, James has not invested money in this property. (Id. at 45:19-21.) 61 Greene has generated a small profit in the past, but at times Johanna contributes funds to its operation, as the property often generates only enough to pay its expenses. (Doc. No. 152 at 15:2-8; Doc. No. 153 at 45:15-18.) Johanna does not receive a salary for managing the property. (Doc.

No. 152 at 15:6-8; Doc. No. 153 at 50:9-13; 51:23-25.)  No distribution of profits or losses has been made.  (Doc. No. 153 at 46:15-17.)

b.  <u>301 Washington Avenue</u>

In 2014, Johanna filed a Chapter 11 Bankruptcy Petition "to protect 301 Washington from a threatened receivership by the mortgage lender."[15]  (Doc. No. 152 at 130:20-21; Doc. No. 153 at 101:20-25; 102:1-14, 24-25; 103:1-3.)  Johanna, as the debtor-in-possession, handled the years-long reorganization without assistance from James.  (Doc. No. 153 at 115:2-4.)  She also paid the legal fees and other costs associated with the bankruptcy proceeding.  (<u>Id.</u> at 102:21-22; 107:21-108:7.)  Since its conception, she has made all payments.  (<u>Id.</u> at 107:14-20.)  While 301 Washington has some income, due to the mortgage's high rate, Johanna "pay[s] 12- to $15,000 a month to sustain [it]."  (<u>Id.</u> at 51:18-20.)  Johanna does not receive a salary for managing this property and is responsible for paying its bills.  (<u>Id.</u> at 51:3-6, 23-25.)

**B.     The Philadelphia Properties[16]**

**1.  Background**

The next stage of the parties' business relationship began in 2002, when Johanna and James elected to expand their real estate ventures to Philadelphia.  (Doc. No. 152 at 52:14-18; 53:1-2.)  They wished to do so for the benefit of their family.  (<u>Id.</u> at 53:5-8.)  Originally, the parties informally agreed that James would contribute cash and that Johanna would contribute her credit to the projects.  (Doc. No. 148 at 19:5-8; Doc. No. 152 at 52:22-25.)  On August 1, 2003, the parties signed a "Partnering Agreement" covering the Philadelphia Properties.  (Doc. No. 148 at 34:1-4;

---

[15]   The mortgage lender was First Central Savings Bank.  (Doc. No. 153 at 103:4-6.)

[16]   Again, the majority of the properties involved in these ventures were lost.  <u>See</u> footnote 4, <u>supra</u>.

Pl.'s Ex. 1.)  The Partnering Agreement sets forth their intention to "own, operate, manage or develop the property jointly . . . ."  (Doc. No. 148 at 34:17-35:1.)  The Partnering Agreement contains eleven "Partnering Obligation[s]."  (Id. at 35:7-10; Doc. No. 2-2, Ex. 1 at Sections 2(a)-(k); Pl.'s Ex. 1.)  The obligations are as follows:

> (a) Each Principal hereby agrees, that each Property has been acquired to generate an economic benefit for both Principals, and that economic benefit shall be shared jointly, and distributed promptly to the individual Principals when realized.

> (b) It is the intent of the Principals to share any Profit from the sale of a Property, or any appreciation of value in a Property, to JM Francis and to J ML Francis pursuant to the Percentages contained on Schedule A. Profit is defined as the net amount received after payment of sales costs, mortgages, or loans, and repayment of the initial capital and advances (collectively, "Initial Capital") contributed or made by either Principal, directly or indirectly, for the purchase of the Property.

> (c) At least quarterly there shall be an accounting and preparation of reports detailing all financial transactions in connection with Property subject to this Agreement, and either party has the right to review documents related to the underlying transactions presented in said quarterly financial reports.

> (d) During the period when a Property has been acquired or owned by an individual Principal in their name only, or through a wholly owned company of that individual, the individual Principal shall be entitled to deduct all tax losses and depreciation (collectively, "Losses") without attributing a pro-rata share of Losses to the other Principal.

> (e) If sold to a third party during the period described in 2(d) the Profit split shall be as described in 2(b).

> (f) Upon the sale of a Property each Principal or their controlled entity will receive any funds advanced as Initial Capital, either directly or indirectly, to initially acquire the Property.  Said funds are not considered a distribution of Profit.

> (g) If the Property is contributed to an entity ("Ownership Entity") in which beneficial ownership, either directly or indirectly, is held by each Principal, then appreciation in value shall be split as described in 2(b), and their capital accounts shall so reflect this division to the entity(ies) owned or controlled by JM Francis and to the entity(ies) owned or

controlled by J ML Francis, pursuant to the Percentages contained on Schedule A.  In such case the Initial Capital shall be noted as part of the records of the Ownership Entity and repaid to the Principals upon wind down and final distributions of the Ownership Entity prior to the Distribution of profit derived from the operations of the Ownership Entity.

(h)   Any distribution of Profit or repayment of Initial Capital due a Principal because of a sale of Property, or wind down and final distributions of the Ownership Entity shall hereafter be called a Required Distribution and shall promptly be paid to the individual Principals when realized.

(i)   If any Required Distribution is not promptly paid by the individual Principal who has control of it, the Principal failing to make such payment ("Defaulting Principal") agrees that the amount thereof shall bear interest at the rate of three percent (3%) above the "national prime" interest rate published from time to time in The Wall Street Journal ("Interest").    Interest shall be non-compounding and accrue immediately on the Required Distribution amount not paid by the Defaulting Principal, and shall be immediately due and payable to the non Defaulting Principal solely from funds of the Defaulting Principal and not from funds held for the mutual benefit of the Principals.

(j)   Property can be added to this list from time to time, by mutual agreement.  Additionally, either Principal may elect, by giving Notice to the other Principal, that certain property acquired by the other Principal be considered Property as defined under this agreement because the Principal acquiring the Property is a Defaulting Principal as defined in 2(h), each Principal's interest in the newly acquired Property, shall be 50%.    If the Defaulting Principal objects the matter must go to arbitration.

(k)   Each Principal hereby agrees to promptly execute any document that is required to evidence this Agreement if such document is required by a third party, taxing authority or other governmental agency to clarify or substantiate the understanding contained in this Agreement.

(Doc. No. 2-2, Ex. 1 at Sections 2(a)-(k).)

If a Philadelphia property was owned individually by James or Johanna, it would not automatically proceed to development; instead, the property first needed to be transferred to an LLC.  (Doc. No. 148 at 39:8-15.)  After this transfer was made, a separate "limited partnership agreement" for certain properties would then control the distribution of profits.  (Id. at 41:5-10.)

14

The Partnering Agreement contains two attachments, dated January 7, 2005 and June 30, 2006, which together list the following properties:

- 718, 719[17], and 720 South 2nd St.

- 207 Monroe St.

- 209 Monroe St.

- 722 South 2nd St.

- 724 South 2nd St.

- 232 S. 3rd St.

- 179 Duane Street

(Doc. No. 2-2, Ex. 1 at 5, 6; Pl.'s Ex. 1.)

These attachments contain percentages, which represent the ownership interests held by the parties.  (Doc. No. 148 at 40:22-25; 41:1.)  These properties, and several others omitted from this list, constitute the core of James and Johanna's Philadelphia projects.  In order to understand the complexity of the projects and the ownership interests in the properties, a brief overview of each venture is warranted.

- **Venture 1**: 115 and 117 North Third Street

  James and Johanna acquired properties located at 115 and 117 North Third Street.  To do so, they formed a limited partnership, Olde North Third LP.  Johanna signed the Limited Partnership Agreement as manager.  Olde North Third LP purchased the properties on March 17, 2004.

- **Venture 2**: 312 Monroe Street and 307 Pemberton Street

---

[17]   It is unclear whether 719 South 2nd Street was part of the Queen's Mews Properties described infra.  In Johanna's Findings of Fact and Conclusions of Law, she initially excludes 719 South 2nd Street from the list (see Doc. No. 184 ¶ 177), but later references "718-724 S. 2nd Street," (id. ¶ 219), which would include 719 South 2nd Street.  During trial, the parties did not refer to 719 South 2nd Street.

The parties acquired 312 Monroe Street and 307 Pemberton Street. As before, they created a limited partnership to make the purchases. This limited partnership was named TrisVanDivi LP. Johanna signed the Limited Partnership Agreement as manager. TrisVanDivi LP bought the property on October 18, 2004.

- **Venture 3**: 207 and 209 Monroe Street

James and Johanna acquired properties located at 207 and 209 Monroe Street. They created a third limited partnership, Queen's Mews West LP, to purchase the properties. Johanna signed the Limited Partnership Agreement as manager. The acquisition of these properties required various transactions, but ultimately Queen's Mews West LP owned 207 and 209 Monroe Street as of January 14, 2005.

- **Venture 4**: 718, 720, 722, and 724 South 2nd Street

James and Johanna acquired properties located at 718, 720, 722, and 724 South 2nd Street. To obtain these properties, they formed Queen's Mews South LP. Johanna signed the Limited Partnership Agreement as manager. Again, the steps taken to purchase these properties are considerable, but ultimately Queen's Mews South LP owned each of the properties as of November 22, 2006.

- **Venture 5**: 232 S. 3rd Street

Johanna independently acquired 232 S. 3rd Street. James has no managerial role in this property.

To manage expenses for these five ventures, James worked with Jerome Lutnick, the accountant, on the entities' tax returns; in doing so, he would "rename" his QuickBooks file "JMF," his initials. (Doc. No. 152 at 142:2-3; 177:20-23; Doc. No. 153 at 68:12-14.) James also assisted Lutnick with preparing balance sheets. (Doc. No. 151 at 129:22-23; Doc. No. 152 at 70:18-20.) Lutnick did not remember being informed of missing funds while working with the parties. (Doc. No. 153 at 69:19-70:4.)

2. **Properties**

a. <u>115 and 117 North Third Street</u>[18]

The first Philadelphia Properties acquired by Johanna and James were 115 and 117 North

Third Street, Philadelphia, Pennsylvania.  (Doc. No. 148 at 45:19; 61:22-62:2; 72:23-25; 73:6-7;

Doc. No. 152 at 67:2-3.)  Johanna and James created a limited partnership, Olde North Third LP,

to own and manage the properties.  (Doc. No. 148 at 65:19-24; Pl.'s Ex. 52.)  On March 11, 2004,

the Olde North Third LP partnership agreement was executed to acquire and manage the properties,

and on March 17, 2004, the limited partnership purchased the 115 and 117 North Third Street

properties.[19]  (Doc. No. 148 at 72:4-6; 73:8-13; Pl.'s Ex. 52; Pl.'s Ex. 58.)  The partners in Olde

North Third LP were several limited liability companies (LLCs) created by Johanna and James.

They were: 1) general partner Etienne Estates at ONT LLC, holding 49% of outstanding

partnership units; and 2) limited partner FFamily Investments ONT LLC[20] holding 51% of

outstanding partnership units.  (Doc. No. 148 at 66:1-2, 23-25; Pl.'s Ex. 52.)

Johanna signed the Olde North Third Limited Partnership Agreement as manager of the

general partner: Etienne Estates at ONT-LLC.  (Doc. No. 148 at 66:10-11, 15-25; 67:1-2; 68:6-9.)

On November 1, 2004, general partner Etienne Estates at ONT LLC transferred 48% of its interest

---

[18]  In her Findings of Fact and Conclusions of Law, Johanna refers to 117 and 119 as constituting the Olde North Third project.  (<u>See</u> Doc. No. 184 ¶ 152.)  However, during trial, the parties referred to 115 and 117 as the relevant properties, and therefore, the Court will consider 115 and 117 as the operative properties.

[19]  In 2008, Olde North Third LP secured a construction loan from TD Bank, which Johanna also personally guaranteed.  (Doc. No. 148 at 73:17-20; 79:22-23; Doc. No. 150 at 22:24-23:8, 13-20, 24:5-6; Pl.'s Ex. 62.)

[20]  FFamily Investments ONT LLC was formed in the State of Delaware on March 10, 2004.  (Doc. No. 148 at 63:19-64:2, 18-24; Pl.'s Ex. 51.)  The sole member of this LLC was Francis Family Investments, for which F.F. Investments LLC was listed as the managing director.  (Doc. No. 148 at 64:16-17, 20-21; 65:12-18; Pl.'s Ex. 51.)

17

to a different entity, Etienne Estates at QMS LLC.  (Doc. No. 148 at 68:1-2; Pl.'s Ex. 53; Pl.'s Ex. 54.)  Therefore, as of November 1, 2004, the ownership of Olde North Third LP was as follows: (1) Etienne Estates at ONT LLC had a 1% interest; (2) Etienne Estates at QMS LLC had a 48% interest, and (3) FFamily Investments ONT LLC had a 51% interest.

On January 7, 2005, general partner Etienne Estates at ONT LLC changed its name in the State of Delaware to EE Realty GP LLC.  (Doc. No. 148 at 70:16-71:1; Pl.'s Ex. 55.)  Johanna is the sole owner and manager of EE Realty GP LLC.  (Doc. No. 148 at 66:10-11, 23-24; 67:1-2; 68:6-9; 70:21-71:1; 82:15-18.)  Similarly, on July 7, 2005, limited partner FFamily Investments ONT LLC changed its name in the State of Delaware to FFamily Investments LP LLC (keeping as the sole member, Francis Family Investments).  (Doc. No. 148 at 71:3-4; Pl.'s Ex. 56.)

### b.   312 Monroe Street and 307 Pemberton Street[21]

The next Philadelphia Properties acquired by Johanna and James were 312 Monroe Street, Philadelphia, Pennsylvania and 307 Pemberton Street, Philadelphia Pennsylvania.  (Doc. No. 149 at 6:3-7; 10:1-18.)  These properties are located on a single lot but have two addresses.  (Id. at 10:19-22.)  Johanna and James created a limited partnership, TrisVanDivi LP, to purchase and develop the 312 Monroe Street property.  (Id. at 8:14-25; 9:1-4; Pl.'s Ex. 129; Pl.'s Ex. 131.)  The Partnership Agreement forming TrisVanDivi LP was executed on October 8, 2004.  (Doc. No. 149 at 8:14-24; Pl.'s Ex. 129.)  On October 18, 2004, TrisVanDivi purchased the real property located at 312 Monroe Street.  (Doc. No. 149 at 10:10-22; Pl.'s Ex. 129; Pl.'s Ex. 131.)  As of November 2004, the partners of TrisVanDivi LP were limited liability companies formed by Johanna and James.   Initially, they were: 1) general partner Etienne Estates at ONT LLC holding ten (10)

---

[21]   307 Pemberton Street is included because this property shares a lot with 312 Monroe Street and is discussed in trial testimony.  However, it is not relevant to James's claims or Johanna's counterclaims.

partnership units; 2) limited partner Etienne Estates at QMS, LLC, holding four hundred eighty (480) partnership units; and 3) limited partner FFamily Investments ONT, LLC, holding five hundred ten (510) partnership units. (Doc. No. 149 at 9:5-9; Pl.'s Ex. 129). Once again, following the creation, transfer and ownership of the LLCs is a daunting task.

After a series of name changes,[22] the partners of TrisVanDivi LP were: 1) general partner EE Realty GP, LLC; 2) limited partner FFamily Investments LP, LLC; and 3) EE Realty LP, LLC. (Doc. No. 149 at 9:5-10:9.)  Johanna controlled the general partner, EE Realty GP, LLC.  (Id. at 9:25-10:2.)

### c.  Queen's Mews Properties

#### i.  207 and 209 Monroe Street (Queen's Mews West)

Next, Johanna and James acquired properties located at 207 and 209 Monroe Street, Philadelphia, Pennsylvania. (Doc. No. 148 at 106:12-16; 109:13-20; Pl.'s Ex. 82.)  On March 5, 2003, Johanna personally signed an agreement to purchase the real estate located at 207 and 209 Monroe Street, Philadelphia, Pennsylvania. (Doc. No. 152 at 46:16-25; Def.'s Ex. 12; Def.'s Ex. 16.) Johanna was the first proposed buyer. (Doc. No. 152 at 54:6-14.) However, on July 23, 2003, James purchased the property located at 207 Monroe Street through an entity he owned named Felix Court LP. (Doc. No. 152 at 50:12-17; 55:11-19.) Later, on October 24, 2003, Johanna signed an agreement to purchase 207 Monroe from Felix Court LP. (Doc. No. 148 at 106:12-16; Doc. No. 152 at 57:7-16; Pl.'s Ex. 82; Def.'s Ex. 16.) And on October 30, 2003, Johanna purchased the contiguous property, 209 Monroe Street, from a third party for $255,000. (Doc. No. 148 at 109:13-20; Pl.'s Ex. 80.) On November 14, 2003, the closing on 207 Monroe occurred. (Pl.'s Ex. 82; Def.'s Ex. 12.) Johanna used her personal funds for the down payment. (Doc. No. 152 at 59:16-

---

[22]  The evidence is convoluted regarding the partnership interests and name changes for the partnerships that had an interest in TrisVanDivi LP.

24.)  The balance of the purchase price was funded by a bank loan.  (Doc. No. 148 at 108:20-25; 109:1-9.)

On January 5, 2005, Johanna and James formed a limited partnership in the State of Delaware named Queen's Mews West LP.  (Doc. No. 148 at 104:3-7, 9-12; Pl.'s Ex. 96.)  The Limited Partnership Agreement for Queen's Mews West LP listed EE Realty GP LLC as the General Partner holding 1% of the partnership units.  (Doc. No. 148 at 104:15-16; Pl.'s Ex. 96.) Johanna was the owner and manager of EE Realty GP LLC.  (Doc. No. 148 at 66:10-11, 23-24; 67:1-2; 68:6-9; 70:21-71:1.)   In addition, two limited partners were named: 1) FFamily Investments-ONT LLC holding 51% of partnership units; and 2) Etienne Estates at QMS LLC holding 48% of the outstanding partnership interests.  (Doc. No. 148 at 104:20-23; Pl.'s Ex. 96; Pl.'s Ex. 97.)  On January 5, 2005, Etienne Estates at QMS LLC changed its name in the State of Delaware to EE Realty LP LLC.  (Doc. No. 148 at 71:6-7; 90:14-22; 91:4-5; 104:24-105:1; Pl.'s Ex. 57.)  FFamily Investments ONT, LLC changed its name to FFamily Investments LP, LLC. (Doc. No. 148 at 105:2-6.)  Johanna was the manager of the general partner and both limited partners.  (Pl.'s Ex. 96.)  On January 14, 2005, Johanna conveyed to Queen's Mews West LP by deed full title and ownership in 207 and 209 Monroe Street.  (Doc. No. 148 at 110:4-12; Pl.'s Ex. 98; Pl.'s Ex. 99.)

ii.  718, 720, 722 and 724 South 2nd Street (Queen's Mews South)

Johanna and James next acquired the real property located at 718, 720, 722 and 724 South 2nd Street, Philadelphia, Pennsylvania.  (Doc. No. 152 at 46:23-47:2; 60:24-61:9; 66:5-7; Def.'s Ex. 12; Def.'s Ex. 15.)  The properties were known as the Queen's Mews South Properties.  (Doc. No. 152 at 47:1-2; 66:3-7.)  Later, Johanna and James created a limited partnership, Queen's Mews South LP, to acquire and manage the properties located at 722 and 724 South 2nd Street, Philadelphia, Pennsylvania.  (Doc. No. 148 at 87:18-23; Pl.'s Ex. 85.)

Johanna and James's involvement with the Queen's Mews South Properties began before they formed the limited partnership, Queen's Mews South LP, that would eventually own two of the properties.  On March 5, 2003, Johanna personally signed an Agreement of Sale to purchase real estate located at 722 South 2nd Street, Philadelphia, Pennsylvania.  (Doc. No. 152 at 46:16-21; Def.'s Ex. 12.)  Johanna was the initial proposed buyer on the Agreement of Sale.  (Doc. No. 152 at 54:6-11; Def.'s Ex. 12.)  Instead, on July 23, 2003, James purchased the property located at 722 South 2nd Street through an entity he owned named Felix Court LP.  (Doc. No. 148 at 95:1-3; Doc. No. 152 at 50:12-19; 55:11-19; Pl.'s Ex. 76.)

On April 25, 2003, Johanna signed an Agreement of Sale to purchase 718 South 2nd and 720 South 2nd Street, Philadelphia, Pennsylvania, and personally purchased both properties on August 15, 2003.  (Doc. No. 152 at 65:9-15; Def.'s Ex. 15; Pl.'s Ex. 77; Pl.'s Ex. 78; Pl.'s Ex. 79.)  Johanna subsequently conveyed these two properties to Queen's Mews South LP.  (Doc. No. 148 at 93:11-25; 94:11-16; Pl.'s Ex. 87.)

On August 13, 2004, Johanna and James formed under the laws of Delaware the limited partnership called Queen's Mews South.  (Doc. No. 148 at 87:18-23; Pl.'s Ex. 85.)  The Limited Partnership Agreement named Etienne Estates at QMS LLC as the General Partner holding 49% of partnership units.  (Doc. No. 148 at 87:25-88:1; 90:11-13; Pl.'s Ex. 85.)  Johanna was the sole owner and manager of general partner Etienne Estates at QMS LLC.  (Doc. No. 152 at 86:4-14.)  The Limited Partner was named as FFamily Investments – QMS LLC, holding 51% of partnership units.  (Doc. No. 148 at 88:1-2; Pl.'s Ex. 85.)  A third partner, Etienne Estates ONT, LLC was added to the partnership.  (Doc. No. 148 at 88:20-89:2, 9; 90:10; Pl.'s Ex. 94.)  On January 5, 2005, Etienne Estates at QMS LLC changed its name in the State of Delaware to EE Realty LP LLC.  (Doc. No. 148 at 71:6-7; 90:14-22; 91:4-5; Pl.'s Ex. 57.)  FFamily Investments – QMS LLC

changed its name to FFamily Investments LP, LLC.  (Doc. No. 148 at 91:2-3.)  Etienne Estates at

ONT, LLC changed its name to EE Realty GP, LLC.  (Doc. No. 148 at 90:24-91:1.)  The final

ownership structure, therefore, consisted of: (1) Etienne Estates at ONT, LLC as a general partner

holding 10%; (2) EE Realty LP, LLC as a limited partner holding 48%; and (3) FFamily

Investments ONT, LLC as a limited partner holding 51%.  (Doc. No. 148 at 90:8-91:5; Pl.'s Ex.

95.)

On August 16, 2004, Queen's Mews South LP purchased 722 South 2nd from Queen's

Mews LP (formerly known as Felix Court LP) by deed for $1.00.  (Doc. No. 148 at 100:24-101:5;

Pl.'s Ex. 88.)  On May 9, 2005, Johanna had acquired 724 South 2nd Street for the sum of

$525,000.00 through a straw party agreement.  (Doc. No. 148 at 97:7-17; Doc. No. 152 at 88:1-

14; Pl.'s Ex. 92.)  On November 22, 2006, Johanna, as the straw party for the grantor, conveyed to

Queen's Mews South LP title and ownership to 724 South 2nd Street.  (Doc. No. 148 at 98:25;

99:1-23; 100:1-8; Pl.'s Ex. 107.)  For the duration of the project, the Queen's Mews Properties had

a general ledger which kept track of receipts and disbursements.  (Doc. No. 152 at 83:9, 13-21;

84:3, 8-9; Def.'s Ex. 130; Def.'s Ex. 232.)  When each of the properties was acquired, Queen's

Mews South LP and Queen's Mews West LP refinanced the properties with a TD Bank loan, which

Johanna personally guaranteed.  (Doc. No. 148 at 112:24-25; 113:1-13; 115:3-8; Doc. No. 152 at

90:13-91:2, 11, 16-18; 105:9-23; Pl.'s Ex. 109.)

### d.  232 S. 3rd Street

On May 24, 2004, Johanna purchased the property located at 232 S. 3rd Street for $950,000.

(Doc. No. 148 at 50:22-24; 52:12-14; Doc. No. 153 at 7:4-8; 19:2-4; Pl.'s Ex. 4.)  Johanna

purchased this property in her own name and funded the down payment through a mortgage, her

personal credit, and the credit of one of her companies, Piccoli Disegni.[23]  (Doc. No. 148 at 49:18-24; Doc. No. 153 at 7:7-8; 17:22-25; 19:5-20; 21:19-20; 22:18-20; 30:22-23.)  Johanna later took out a second mortgage on the property, which James characterized as a "home equity loan."  (Doc. No. 148 at 44:14-25; 47:7-8; Pl.'s Ex. 3.)  She is the named purchaser on the settlement sheet for 232 S. 3rd Street and she held title to the property.  (Doc. No. 148 at 58:1-5; Doc. No. 153 at 18:18-19:1; Def.'s Ex. 28.)  Johanna did not transfer title to this property and the property never reached the development stage.  (Doc. No. 148 at 58:6-8; 60:1-3, 22-25; Doc. No. 153 at 7:9-11; 23:1-3.)  James confirmed this fact, noting that the parties did not plan to develop 232 S. 3rd Street.  (Doc. No. 148 at 58:10.)  The property has been "continually held by Johanna."  (Id. at 58:5, 11.)

In acquiring and owning the property, Johanna covered all expenses, including the mortgage, taxes, maintenance, and legal fees.  (Doc. No. 153 at 8:9-10; 27:9-17.)  James has not paid, and currently does not pay, for these expenses.  (Id. at 8:16-23.)  The property is not rented, but instead is utilized by Johanna solely for personal use, often when she visits Philadelphia.  (Id. at 9:23-24; 28:1, 4-6.)  James temporarily resided at the property but did not pay rent.  (Id. at 8:23-9:3.)  Johanna eventually "found the house completely cleaned out of all [her] belongings, all the original furnishing of the house and everything else."  (Id. at 8:24-25; 9:17-19.)  She then filed a police report.  (Id. at 9:19.)  Later, upon being sued by her neighbors under the "Pennsylvania Conservatorship Law" because of the condition of the property, Johanna defended the suit without James's assistance, paid for the corresponding legal fees, and paid for the cleanup.  (Doc. No. 148 at 58:12-21; Doc. No. 153 at 23:17-25; 24:13-25:16, 20-21; 26:6-22, 25; 27:1-3; Pl.'s Ex. 6.)

---

[23]  Johanna made the down payment (Doc. No. 153 at 19:5-8), but acknowledged that James "did [an] agreement of sale," contributing $1,000 down, which she paid back.  (Doc. No. 153 at 17:20-21.)

Citibank, the lender, initiated foreclosure proceedings against the property, but Johanna reached an agreement with the bank.  (Doc. No. 153 at 8:1-8; 16:21-25.)  James has no rights in the property, whether by "ownership interest" or by "other agreements" between the parties.  (Id. at 29:11-30:3.)  Johanna still owns the property.  (Id. at 7:15-18; 30:22-23.)

### 3.  Management of the Philadelphia Properties

#### a.  James Fails to Complete Development of the Philadelphia Properties

James's company, Phoenix Design Build ("Phoenix"), was the design-builder and general contractor assigned to develop the Philadelphia Properties.  (Doc. No. 148 at 76:13-20; 77:3-4, 9-13; 81:5-9; Doc. No. 150 at 91:10-13.)   Phoenix did not complete the construction or development of any Philadelphia property.  (Doc. No. 148 at 80:7-10; 116:15-17; Doc. No. 152 at 109:6; 118:15-20.)  James stopped work at the Queen's Mews Properties (207 and 209 Monroe Street, Philadelphia, Pennsylvania, and 718, 720, 722, and 724 South 2nd Street, Philadelphia, Pennsylvania) and at Olde North Third Properties (115 and 117 North Third Street, Philadelphia, Pennsylvania)[24] in 2008, and he never began any construction or development work at the TrisVanDivi Property (312 Monroe Street, Philadelphia, Pennsylvania).[25]  (Doc. No. 148 at 116:9, 15-17; Doc. No. 152 at 109:6; 114:1-14.)  The abandonment of the projects led to lenders filing confessions of judgments against Olde North Third, Queen's Mews, TrisVanDivi, and Johanna personally.  (Doc. No. 148 at 83:22-25; 84:1-2; 116:21-23; Doc. No. 149 at 15:15-18; 31:21-23; Doc. No. 150 at 34:12-16; Pl.s' Ex. 69; Pl.'s Ex. 113.)

---

[24]  On June 21, 2008, Olde North Third LP and Phoenix Groups Design-Build LLC (James's company) signed an Agreement Between Owner and Design Builder to develop 115 and 117 North Third Street, Philadelphia, PA.  (Doc. No. 148 at 76:16-20; 77:14-17; Pl.'s Ex. 61.)

[25]  TrisVanDivi filed a federal income tax return in 2005 showing minimal activity because construction was not started.  No expenses were booked and reported to the tax authorities.  (Def.'s Ex. 76.)

Johanna was not involved with the construction of the Philadelphia Properties, (Doc. No. 152 at 114:10), nor did she supervise the use of construction funds by Phoenix.  (Doc. No. 150 at 59:9-11; Doc. No. 152 at 114:23-25.)  One reason for James's failure to complete construction was that he frequently made changes to the construction drawings and designs.  (Doc. No. 152 at 114:10-13; 116:20-117:1; 118:15-22.)   Further, Phoenix did not use construction funds in accordance with the requisitions.  (Id. at 115:1, 16-20.)  Ultimately, Johanna had to self-fund some development costs for the Philadelphia Properties.  (Id. at 95:21-22; 114:2-4; 116:17-23.)  She also sought an extension on the existing TD Bank construction loan held by Queen's Mews LP.  (Doc. No. 148 at 112:23-113:13; Doc. No. 152 at 67:15-17; 90:13-91:2; 119:15-21; 120:6-9; Pl.'s Ex. 108; Pl.'s Ex. 109; Def.'s Ex.127.)  Later, Johanna met with TD Bank to discuss a loan workout regarding the Queen's Mews Properties and sought James's assistance because she feared confessions of judgments were going to be entered against her.  (Doc. No. 150 at 69:12-70:4, 9-18, 23-71:2; 72:4-18.)  She asked him to attend a meeting with TD Bank, although this meeting never occurred.  (Doc. No. 150 at 69:12-70:4, 9-18, 23-71:2; 72:4-18.)  Further, acting through EE Realty GP LLC, she directed funds to Queen's Mews South LP, Queen's Mews West LP, TrisVanDivi LP, and Olde North Third LP.  (Doc. No. 152 at 138:2-5; 140:22-141:3.)  These advances were documented in the general ledger and in tax returns.  (Doc. No. 152 at 183:21-184:4; 11-13, 18-25; 185:1-2; 187:5-188:2; Def.'s Ex. 106; Def.'s Ex. 107; Def.'s Ex. 111.)

In 2010, toward the end of the parties' business relationship, Johanna continued to seek ways to protect the properties.  For example, Kendall Jones, the TD Bank employee, "had multiple conversations on the phone with Mrs. Francis [and] by email" regarding a loan workout for Olde North Third.  (Doc. No. 150 at 32:10-13.)

25

b.   <u>James Takes Control of the Philadelphia Partnerships</u>

In 2010, James took control of the Philadelphia partnerships by removing Joanna as the general partner.[26]  (Doc. No. 149 at 18:9; Doc. No. 151 at 66:11-16; 67:13-14.)  To do so, on August 6, 2010, James reached out to counsel regarding the ownership of the Philadelphia limited partnerships.  (Pl.'s Ex. 64.)  On August 9, 2010, counsel sent James a memorandum regarding gaining control of four limited partnerships.  (Doc. No. 149 at 18:16-23; Pl.'s Ex. 40.)  This memorandum stated:

> ….To accomplish the end result of your acquiring control of the Limited Partnerships, we could interpret 40§§14.1 and §14.2 of each Limited Partnership Agreement to the effect that by majority vote, the Limited Partners can amend the Limited Partnership Agreements to change which of the Partners are the General Partner and which of the Partners are the Limited Partners.  Those Sections read as follows…[the sections were next quoted in the memorandum].

(Pl.'s Ex. 40.)

Next, James took steps to remove Johanna as the manager of Francis Family Investments. (Doc. No. 151 at 66:11-16; Doc. No. 153 at 40:9.)  To accomplish this end, James procured on August 12, 2010, from his mother, Evelyn Francis, a consent of the members of Francis Family Investments.  (Doc. No. 149 at 22:11-16.)  The consent of the members was signed by Evelyn Francis as holder of 32.3 units of Francis Family Investments and James as holder of 19.25 units of Francis Family Investments through his company FF Investments LLC, which held 51% of the partnerships owning the Philadelphia Properties.  (Doc. No. 149 at 27:5-8, 11-19; Pl.'s Ex. 42.)

---

[26]   The sequence of events leading to Johanna's removal is difficult to follow.  Ultimately, Johanna was removed as the general partner of all entities that controlled the Philadelphia Properties, including: 1) Francis Family Investments; 2) Queen's Mews West LP and Queen's Mews South LP; 3) TrisVanDivi LP; 4) Olde North Third LP; and 5) EE Realty LP LLC.  (Doc. No. 149 at 17:25-18:23.)

Pursuant to this consent of members, Francis Family Investments voted and removed Johanna as manager.  (Doc. No. 149 at 26:1-13; 27:11-19; Doc. No. 151 at 66:11-16; 67:13-14; Pl.'s Ex. 42.)

Further, on August 13, 2010, James noticed a meeting to be held on August 24, 2010, to vote Johanna out as general partner of Queen's Mews South and West and purportedly sent notice of the meeting to Johanna.   (Pl.'s Ex. 43.)  James also sent an email to Johanna enclosing the notice.  (Id.) On August 16, 2010, James emailed Johanna, attempting to persuade her to relinquish control over the projects.  (Def.'s Ex. 183.)

On August 24, 2010, James purportedly removed Johanna as the general partner of all entities that controlled the Philadelphia Properties and Partnerships and placed himself as the general partner and the sole manager of Francis Family Investments.  (Doc. No. 149 at 22:15-16, 23; 23:5-12; 24:4-5, 22-23; 25:12; 32:18-21; 161:23-162:2.)  On August 24, 2010, James, through his counsel, prepared and executed an Amended and Restated Limited Partnership Agreement for TrisVanDivi LP.  (Doc. No. 149 at 25:4-8; 151:20-152:3; Pl.'s Ex. 135.)  James, through counsel, also prepared and executed similar Amended and Restated Limited Partnership Agreements for Queen's Mews (Doc. No. 149 at 23:15-18, 22-23; 9-15; 24:12-15; Pl.'s Ex. 114; Pl.'s Ex. 115) and Olde North Third (Doc. No. 149 at 22:18-21; 33:11-14; Pl.'s Ex. 67.)  James accomplished these changes by appointing FFamily Investments LP LLC (wholly owned by Francis Family Investments) as the general partner of the Philadelphia Properties and making himself manager of not only this entity, but also Francis Family Investments and EE Realty LP LLC (an entity which Johanna had owned solely and controlled outright).  (Doc. No. 149 at 35:2-36:3; Pl.'s Ex. 71.)  At this point, James was allegedly using the company credit cards for personal expenditures.  (Def.'s Ex. 166.)

James accomplished Johanna's ouster in violation of Section 14.1 (b) of the Limited Partnership Agreements for Olde North Third, TrisVanDivi and the Queen's Mews Properties. Section 14.1(b) provides as follows:

> Notwithstanding Sections 8.3 and 14.1(a), this Agreement may not be amended without the consent of each Partner adversely affected if such amendment would (i) convert a limited partner's interest in the partnership into a General Partner's interest; (ii) modify the limited liability of a Limited Partner; or (iii) alter in the interest of a Partner in Profits, Losses, other items or any Partnership distributions.

(Doc. No. 151 at 68:9-12, 21-25; Def.'s Ex. 278).

### c. James's Transactions Regarding the TrisVanDivi Property

#### i. October 2010 Transaction Regarding 312 Monroe Street

In October 2010, shortly after James removed Johanna as general partner, James tried to liquidate the TrisVanDivi Property located at 312 Monroe Street in Philadelphia.  On October 2, 2010, James received title insurance for the TrisVanDivi Property in anticipation of a real estate transaction.  (Doc. No. 149 at 121:12-22; 122:1-17; Def.'s Ex. 199.)

On October 6, 2010, James formed "Three 12 LP" to acquire 312 Monroe Street, Philadelphia, Pennsylvania from TrisVanDivi LP.  (Doc. No. 149 at 49:25-50:1, 8-11; 169:8-12; Pl.'s Ex. 137.)  James, through counsel, prepared and executed a Limited Partnership Agreement for Three 12 LP, assigning FFamily Investments LP LLC as the limited partner holding 99.99% of the capital and equity, and Three 12 Realty Associates LLC as the general partner and holding .01% of capital and equity.  (Doc. No. 149 at 50:18-22; Doc. No. 151 at 6:6-12, 21-25; 7:1; 16:17-20; 17:1-4; Pl.'s Ex. 137.)  FFamily Investments LP LLC is owned by Francis Family Investments.  (Doc. No. 151 at 6:24-7:7; 9:24-25; 10:1; 17:4-5.)  Johanna did not personally have an interest in Three 12 LP.  (Doc. No. 151 at 10:2-15.)  Johanna, however, was a member of Francis Family Investments, which is the sole member of FFamily Investments LP LLC.  James also formed

Pemberton Assets LLC ("Pemberton"), whose sole member was Three 12 LP.  (Doc. No. 149 at 52:4-8; Doc. No. 151 at 13:12-20; 14:4; Pl.'s. Ex. 139.)  James was the manager of Pemberton. (Doc. No. 151 at 13:12-21; 14:4-5; Pl.'s Ex. 139.)

Ultimately, Johanna defaulted on the loan on the 312 Monroe Street Property held by Independent Mortgage Company ("IMC").  (Doc. No. 149 at 15:25-16:6, 15-20; Pl.'s Ex. 133.) Lutnick and Arnold Meat's Retirement Fund ("Lutnick loan") loaned money to either Pemberton or Three 12 LP (the evidence is unclear) so that Pemberton or Three 12 LP could buy the mortgage and judgment on the 312 Monroe Street Property held by Independent Mortgage Company ("IMC") (Doc. No. 149 at 53:11-13; 132:21-23; 55:10-25; 56:1-2, 9-11, 13-21; Pl.'s Ex. 142.)[27]

At a closing on the Lutnick loan, distributions were made to several third parties.  First, a distribution was made to IMC for $184,195.00.  (Doc. No. 149 at 163:3-5; Def.'s Ex. 206.) Additionally, a disbursement was made to Francis Family Investments for $91,000.  (Doc. No. 149 at 163:6-8; Def.'s Ex. 206.)[28]  James was the only person who controlled these funds distributed to Francis Family Investments.  (Doc. No. 149 at 163:16-21.)  According to James, this money was used to save Queen's Mews West, Queen's Mews South, and ONT from foreclosure and for property maintenance.  (Id. at 172:11-173:6.)

Finally, a distribution of $64,660.06 was made to Three 12 LP.  (Id. at 163:22-24; Def.'s Ex. 206.)  James was only person who controlled these funds.  (Doc. No. 149 at 163:25-164:6.) The funds paid to Three 12 LP may have been used either to make a loan of $66,000 to Olde North

---

[27]  The parties do not indicate which transaction was the basis for this closing.

[28]  James was not aware of the distributions after the funds left Francis Family Investments, but he does agree that some was used for work on Queen's Mews West, Queen's Mews South, and ONT.  (Doc. No. 149 at 172:15-19; 173:1-6.)

Third or for other reasons; James was unsure.  (Id. at 174-181, 182:2-16; Doc. No. 150 at 62:12-18; 24-25; 63:1-2.)  The money is not properly accounted for in the evidence of this case.

ii.   2014 Deed-In-Lieu of Foreclosure Transaction
Regarding 312 Monroe Street

From October 2010 through 2014, James attempted to develop and/or sell the TrisVanDivi Property.  (Doc. No. 149 at 66:4-7, 19-24.)  In the interim, however, on December 13, 2012 Evelyn Francis revoked his authority to use her shares to act on behalf of any of the entities.  (Doc. No. 153 at 39:3-4, 23-24; Def.'s Ex. 289; Def.'s Ex. 290; Def.'s Ex. 291.)  Ultimately, however, he engaged in a deed-in-lieu of foreclosure transaction which allowed him to transfer the TrisVanDivi Property to an investor.  (Doc. No. 149 at 141:6-8.)

On July 11, 2014, TrisVanDivi (with James as the general partner) executed and delivered a Deed-In-Lieu of Foreclosure to 312 Monroe Partners LP.  (Id. at 64:10-24; Doc. No. 151 at 14:7-23; Pl.'s Ex. 158.)  312 Monroe Partners LP accepted legal title to the property in exchange for the satisfaction of a mortgage that it purchased from Pemberton and held against TrisVanDivi.  (Doc. No. 149 at 64:12-65:1, 8-16; Pl.'s Ex. 158.)  On August 4, 2014, the Deed-In-Lieu of foreclosure was recorded, and 312 Monroe Partners, LP began developing the property without assistance from Johanna and James.  (Doc. No. 149 at 71:10-15; Doc. No. 151 at 21:23-24.)  Lutnick, who loaned money to James for the 2010 transaction regarding the TrisVanDivi Property, was not repaid as part of the Deed-In-Lieu 2014 transaction.  (Doc. No. 149 at 148: 19-25; 149:1-7.)

A disbursement statement at the closing held on July 11, 2014 documents the funds received and disbursed.  (Doc. No. 151 at 19:2-4, 7; Def.'s Ex. 313.)  First, Pemberton Asset LLC (James's company) received $308,312.11.  (Doc. No. 151 at 19:8-11; Def.'s Ex. 313.)  Pemberton Asset LLC also received, as noted separately on a disbursement statement, another $34,863.31.  (Doc. No. 151 at 20:10-12.)  Additionally, Phoenix Group LLC (James's company) received

30

$120,000.  (Id. at 20:3-5; Def.'s Ex. 313.)  According to James, this money was for work his company Phoenix Design and Development performed in 2009 and 2010.  (Doc. No. 151 at 21:8-14.)  Finally, Three 12 Realty LLC, another one of James's companies, received $55,000.00.  (Id. at 20:7-9; Def.'s Ex. 313.)  Although James testified that the money he received in 2014 was used to save Olde North Third and to save James's capital invested in Olde North Third and other projects (Doc. No. 149 at 149:6-15), there is no evidence that he accounted for this use of money.

### d.  James's Transactions Regarding 115 and 117 North Third Street

At some point, Olde North Third defaulted on the 2008 loan from TD Bank.  (Doc. No. 148 at 79:4-8, 14-16; Doc. No. 149 at 159:23-160:2; Doc. No. 150 at 27: 22-25; 28:1-4; Pl.'s Ex. 63.)  TD Bank sent a notice of loan default to Olde North Third, to the attention of Johanna Francis and EE Realty GP LLC.  (Doc. No. 148 at 79: 4-8, 14-16; Doc. No. 150 at 27:22-28:4; Pl.'s Ex. 63.)  Kendall Jones testified that in sending the default letter, the bank "didn't look at it as any specific person's actions or lack of actions."  (Doc. No. 150 at 28:22-29:1.)  TD Bank communicated with both Johanna and James about the default.  (Doc. No. 150 at 32:10-20.) As of September 21, 2010, TD Bank understood Johanna to be the general partner of Olde North Third. (Id. at 34:24-35:1-4, 11-16.)

In June 2012, TD Bank provided additional funds to Olde North Third under a mortgage personally guaranteed by James ("Olde North Third 2012 Mortgage").  (Id. at 37:16-20; 38:19-24; 39:15-21; Pl.'s Ex. 72.)  The money was to be used for continued construction of ONT.  (Doc. No. 150 at 39:12-16.)  At this point, TD Bank believed that James was the general partner of Olde North Third, LP.  (Id. at 38:1-7.)  Johanna was not involved with this loan.  (Id. at 38:1-7; 39:22-24.)

Olde North Third owned historic tax credits purchased when Johanna managed the LLCs that were the general partners of the entities managing the New York Properties. (Doc. No. 151 at 26:23-25; 27:1-3.) The tax credits did not vest until the Olde North Third development project was completed. (Id. at 27:14-17.) James pledged the tax credits as collateral for a loan modification and used them to benefit a lessee of the Olde North Third Properties, without Johanna's knowledge, approval, or participation. (Id. at 26:20-22; 27:14-28:3; 29:19-23.) The tax credit no longer exists because the Olde North Third Properties were lost in foreclosure. (Id. at 27:14-17; 31:17-21; 32:9-11; 41:19-23.) The tax credits are currently of no value to either party. (Id. at 27:14-17; 31:17-21; 32:9-11; 33:6-7; 41:19-23.)

James failed to complete the construction and development of the Olde North Third project despite receiving substantial funds through the Olde North Third 2012 Mortgage and other sources. (Doc. No. 150 at 40:2-7.) TD Bank eventually sold the loan on Olde North Third to a third party. (Id. at 40:2-11, 23-25; 41:1-5.) On July 20, 2018, James sued LCP North Third LLC, the entity that purchased the TD Bank Olde North Third loan and foreclosed the property.[29] (Doc. No. 149 at 78:23-79:6, 9-12; Doc. No. 151 at 34:17-19, 22-25; 35:18-20; Def.'s Ex. 346.)

e.  James's Transactions Regarding the Queen's Mews Properties at 207 and 209 Monroe Street, Philadelphia, Pennsylvania, and 718, 720, 722, and 724 South 2nd Street, Philadelphia, Pennsylvania

In 2011, James filed a Chapter 11 Bankruptcy Petition for Queen's Mews West in the United States Bankruptcy Court for the Eastern District of New York, without Johanna's consent or knowledge. (Doc. No. 153 at 126:7-15; Def.'s Ex. 252.) James filed a similar bankruptcy petition for Queen's Mews South and Olde North Third in the same forum, but all the bankruptcies

---

[29]  This lawsuit remained active through the date of trial in this case. (Doc. No. 151 at 35:11-13.)

were dismissed.  (Doc. No. 153 at 126:19-21.)  James took no other action to protect the Queen's

Mews Properties, and ultimately they were lost in foreclosure in a Sheriff sale in Philadelphia.

(Doc. No. 149 at 74:12-24; Pl.'s Ex.118.)  James filed the bankruptcies for the Queen's Mews

Properties even though he knew there was no way to save them.[30]  (Doc. No. 149 at 77:24- 78:6.)

## III.    CONCLUSIONS OF LAW

### A.    James's Claims

#### 1.    James Has Not Proven by a Preponderance of the Evidence that He is Entitled to Equitable Relief

In Count I of his Complaint, James seeks equitable relief in the form of a quiet title.  (See

Doc. No. 2-2, Ex. A ¶¶ 5-18.)  Specifically, he seeks to quiet title to 232 S. 3rd Street, Philadelphia,

Pennsylvania.  (See id.)  In support of this claim, he states in Count I that the Partnering Agreement

grants equal ownership in the property located at 232 S. 3rd Street and an equal share of benefits.

(Id. ¶¶ 5-6.)  James further alleges that Johanna has disregarded the Partnering Agreement and has

instead "wrongfully and improperly held herself out to be the legal owner of that property" and

"has caused herself to be the title owner . . . [in which] she has caused several Mortgages to be

recorded against the property of which Plaintiff became aware, but never agreed to . . . . [and]

allowed judgment liens to be entered upon 232 S. 3rd St. . . ." (Id. ¶¶ 12-13, 15.)  Additionally, he

alleges that Johanna "has failed and refused to provide any accounting detailing all financial

transactions regarding the [sic] 232 S. 3rd St. . . ." and "has failed and refused to share in any

economic benefit generated from 232 S. 3rd St. as was intended and agreed upon by the parties."

(Id. ¶¶ 17-18.)

---

[30]   James testified that TD Bank's intention at that time was to foreclose.  The Bank was not interested in any negotiations.  (Doc. No. 149 at 77:24-78:6.)

a.   <u>Pennsylvania Law on Quiet Title</u>

Actions to quiet title are governed by Pennsylvania Rule of Civil Procedure 1061.   Pa. R.C.P. 1061.   Rule 1061(b) provides:

> The action may be brought: (1) to compel an adverse party to commence an action of ejectment; (2) where an action of ejectment will not lie, to determine any right, lien, title or interest in the land or determine the validity or discharge of any document, obligation or deed affecting any right, lien, title or interest in land; (3) to compel an adverse party to file, record, cancel, surrender or satisfy of record, or admit the validity, invalidity or discharge of, any document, obligation or deed affecting any right, lien, title or interest in land or (4) to obtain possession of land sold at a judicial or tax sale.

<u>Id.</u> (b)(1)-(4).

There are four subsections in Rule 1061(b).   <u>Id.</u>   James does not identify the subsection of Rule 1061 under which he seeks relief.   Based upon the facts, however, and because he is proceeding <u>pro se</u>, his claim appears to be one under either Rule 1061(b)(1) or Rule 1061(b)(2). It is easier to conclude that he is proceeding under Rule 1061(b)(2) because he alleges that: "[t]his action is brought, in part, pursuant to Rule 1061 of the Pennsylvania Rules of Civil Procedure <u>to determine Plaintiff's right, title or interest</u> in 232 South 3rd Street . . . ."  (Doc. No. 2-2, Ex. A ¶ 3) (emphasis added).   This language mirrors in part the language in Rule 1061(b)(2).   But both subsections will be addressed in turn.

First, Rule 1061(b)(1) covers a situation where a plaintiff wants to compel an adverse party to commence an ejectment action.   To do so, a plaintiff must be in possession of the land.   <u>See</u> <u>Franceski v. Linde Corp.</u>, No. 1667 EDA 2021, 2022 WL 17588737, at *3-4 (Pa. Super. Ct. Dec. 13, 2022) (citation omitted); <u>Catanzaro v. Pennell</u>, 238 A.3d 504, 508 (Pa. Super. Ct. 2020). Although he may not reside in or use the land, he must have enough of an indicia of possession to commence the ejectment action.   <u>See</u> <u>Franceski</u>, 2022 WL 17588737 at *4; <u>Bruzgulis v. Landowners Wildlife Protective Ass'n</u>, No. 952 MDA 2017, 2018 WL 2077837, at *2 (Pa. Super.

34

Ct. May 4, 2018) (citing Moore v. Duran, 687 A.2d 822, 827 (Pa. Super. Ct. 1996)).  His aim is to force the defendant to file an ejectment action in order to adjudicate the "immediate rights" between the plaintiff and the defendant as to the property in question.  See Franceski, 2022 WL 17588737, at *3; see also Catanzaro, 238 A.3d at 508.

Second, Rule 1061(b)(2) covers a situation where an action of ejectment will not lie because a plaintiff does not have possession of the land, but he seeks to determine, inter alia, his right, title, or interest in the land.  Pa. R.C.P. 1061(b)(2).  Traditionally, a quiet title action is filed to determine the relative and respective rights of all potential title holders to the land.  Franceski, 2022 WL 17588737, at *3.  In this case, in which James is suing Johanna, it is being used to determine only their interests.  Thus, given the significance of whether a plaintiff has possession of the land or real property, a definition of possession is required.  In Bruzgulis, the court addressed this concept as follows:

> There is no precise definition of what constitutes possession of real property; the determination of possession is depend[e]nt upon the facts of each case, and to a large extent upon the character of the land in question.  Schimp v. Allaman, [ ] 659 A.2d 1032 ( [Pa. Super.] 1995).  In general, however, actual possession of land means dominion over the property; it is not the equivalent of occupancy.  Glenn v. Shuey, [ ] 595 A.2d 606 ([Pa. Super.] 1991).  Thus, the trial court must determine which party exercised dominion and control over the property before determining what is the proper form of action in such a case.

2018 WL 2077837, at *2 (citing Moore, 687 A.2d at 827); see also Moore, 687 A.2d at 828 ("Actual possession of property may be established in connection with the maintenance of a residence . . . or by making improvements to the land and paying property taxes.") (citation omitted); Bruzgulis, 2018 WL 2077837, at *2 ("Actual possession is presumed to be in him who has the record title.") (citing Overly v. Hixson, 82 A.2d 573, 575 (Pa. Super. Ct. 1951)).

Given these legal precepts, the Court must determine whether James has proven by a preponderance of the evidence his two claims under Pennsylvania Rule of Civil Procedure 1061(b)(1) and (2).

> **b.   James Has Not Proven by a Preponderance of the Evidence**
> **a Viable Claim to Ejectment Under Pennsylvania Rule**
> **of Civil Procedure 1061(b)(1)**

As noted, Section 1061(b)(1) provides that a plaintiff can assert a claim to quiet title "to compel an adverse party to commence an action of ejectment." Pa. R.C.P. 1061(b)(1). And as noted previously, possession by a plaintiff is a key factor in a claim to quiet title under Section 1061(b)(1):

> [t]he existence of possession on the part of the [plaintiff] at the time of the institution of the proceeding is an essential jurisdictional fact. Where there is a dispute regarding possession, the trial court cannot proceed to the merits of the action without first determining whether the plaintiff is in possession. Thus, clearly, possession is a jurisdictional prerequisite for Rule 1061(b)(1).

See Siskos v. Britz, 790 A.2d 1000, 1007 (Pa. 2002) (internal quotation marks and citations omitted).

The elements of a 1061(b)(1) claim, therefore, require a plaintiff to establish: [1] "[he] is in possession [of the property], [2] that the defendant is out of possession, and [3] that there is a dispute [between the parties] as to the title of land . . . in question." Catanzaro, 238 A.3d at 508 (substantive alterations in original) (citation omitted). Under 1061(b)(1), possession "must be an actual possession of which there is no substantial dispute, and it must be physical possession, not merely the right of possession that can be vested in a person." Ross v. Ross, No. 84 C.D. 2020, 2021 WL 5894871, at *5 (Pa. Commw. Ct. Dec. 14, 2021) (citations omitted).

Here, James has failed to plead, let alone prove by a preponderance of the evidence, that he is in actual possession of 232 S. 3rd Street. Specifically, he has not proven by a preponderance

of the evidence that he has exercised dominion and control over it.  First, the facts show that Johanna purchased 232 S. 3rd Street in her own name.  (Doc. No. 153 at 7:4-8.)  She holds title to the property and even James recognized at trial that the property was "continually held" by her. (Doc. No. 148 at 58:2-5, 11; Doc. No. 153 at 18:18-19:1.)  Johanna funded the down payment through a loan she obtained secured by a mortgage, her personal credit, and the credit of one of her companies, Piccoli Disegni.  (Doc. No. 148 at 49:18-24; Doc. No. 153 at 7:3-8; 17:22-25; 19:5-20; 21:19-20; 22:18-20; Def.'s Ex. 28.)  Second, she has covered all expenses on the property, including the mortgage payments, taxes, maintenance, and legal fees.  (Doc. No. 153 at 8:9-15; 27:9-17.)  Third, while James briefly resided at 232 S. 3rd Street, after he left, Johanna entered the property and "found the house completely cleaned out of all [her] belongings, all the original furnishing of the house and everything else."  (Id. at 8: 24-9:1, 17-19.)  She even filed a police report.  (Id. at 9: 19.)  232 S. 3rd Street is not rented, but instead is utilized by Johanna solely for her personal use.  (Id. at 9:23-24; 28:1, 4-6.)  Fourth, when she was sued by her neighbors over the condition of the property, she defended the suit without James's assistance, paid the legal fees, and paid for repairs.  (Doc. No. 148 at 58:18-21; Doc. No. 153 at 23:17-25; 24:13-21, 24-25; 25:1-16, 20-21; 26:6-22-25; 27:1-3.)

Moreover, in Count I, James is not suing for possession based on a breach of the Partnering Agreement.  While he relies on the Partnering Agreement to support his joint ownership of 232 S. 3rd Street and his right to share in corresponding benefits, the Agreement does not contain provisions on the possession of the properties, nor does James assert that it does.  The Partnering Agreement merely states that: "each Property has been acquired to generate an economic benefit for both Principals."  (Doc. No. 2-2, Ex. 1 at Section 2(a); Pl.'s Ex. 1.)  It does not address possession.  In sum, James has not proven by a preponderance of the evidence that he exercises

dominion and control over 232 S. 3rd Street and has possession of this property.  Without proving

possession, an action to quiet title by an ejectment action under Rule 1061(b)(1) will not lie.

And given his failure to establish the first element of a 1061(b)(1) cause of action, the Court

need not address the second and third elements: whether Johanna is in possession of 232 S. 3rd

Street and whether there is a dispute to the title of the land in question.

> ### c. James Has Not Proven by a Preponderance of the Evidence a Viable Claim to Quiet Title Under Pennsylvania Rule of Civil Procedure 1061(b)(2)

As stated earlier, Section 1061(b)(2) provides that a plaintiff can assert a claim to quiet title

"where an action of ejectment will not lie, to determine any right, lien, title or interest in the land

or determine the validity or discharge of any document, obligation or deed affecting any right, lien,

title or interest in land."  Pa. R.C.P. 1061(b)(2).  Thus, under 1061(b)(2), to prove this claim, a

plaintiff "must demonstrate that an ejectment action will not lie.  In addition, the same party must

also demonstrate that [he] is not in possession, that [he] does not have the right to possess the

property, and that [he] wishes to determine all rights in the property."  Pennsylvania v. Thomas E.

Proctor Heirs Trust, Civ. No. 1:12-CV-1567, 2014 WL 3696288, at *5 (M.D. Pa. July 24, 2014)

(alterations added) (citations omitted).  Thus, there are four elements to a claim under Rule

1061(b)(2).  They are: (1) an action in ejectment will not lie; (2) plaintiff is not in possession of

the property; (3) plaintiff does not have the right to possess the property; and (4) plaintiff wishes

to determine all rights in the property.  Unlike an ejectment action, where a plaintiff must establish

that he has possession of the property, to quiet title under 1061(b)(2), a plaintiff must establish that

he does not have the right to possess the property.  This is the element which James has not proven

by a preponderance of the evidence.

First, the interest that he seeks to vindicate under Rule 1061(b)(2) is in sharing in the economic benefits derived from 232 S. 3rd Street. He also seeks an accounting of all transactions relating to this property. Although these allegations are contained in the Complaint, at trial he relied on the terms of the Partnering Agreement and its promised share of benefits to support his claims regarding 232 S. 3rd Street. (See Doc. No. 148 at 35:9-36:2.) His focus was on the financial benefit, specifically seeking to have the benefits of ownership recognized, rather than whether he had the right to possess 232 S. 3rd Street.

Second, James references possession in relation to this property only once in his Proposed Findings of Facts and Conclusions of Law. In his Conclusions of Law, he states: "[a]n award and jud[g]ment for use and occup[a]ncy of 232 S. 3rd Street, the reco[g]ni[]tion of the 51% interests." (Doc. No. 201 at 45.) Here, James is asserting, albeit obtusely, that he wants to be compensated for Johanna's "use and occupancy" of the property. He does not focus in his testimony at trial or through exhibits that he does not have a right to possess 232 S. 3rd Street. Possession is not addressed at all. Accordingly, James has not shown by a preponderance of the evidence that he does not have a right to possess 232 S. 3rd Street.

Given his failure to prove this element, there is no need to determine whether he has proven the other elements of an action under Rule 1061(b)(2). Thus, regarding Rule 1061, James has failed to prove by a preponderance of the evidence a viable 1061(b)(1) or 1061(b)(2) claim to quiet title. Consequently, James is not entitled to equitable relief to quiet title to 232 S. 3rd Street.

## 2. James Did Not Prove by a Preponderance of the Evidence that Johanna Breached the Partnering Agreement

Next, James asserts in Count II of his Complaint that Johanna breached the Partnering Agreement, which covers the Philadelphia Properties. Specifically, he claims that Johanna's

"misconduct" caused the Philadelphia Properties to be "unreasonably encumbered and/or lost"[31] and that she "failed and refused to provide annual financial statements, tax returns or other financial information regarding the operations of the properties and automobiles governed by the Partnering Agreement." (Doc. No. 2-2, Ex. A ¶¶ 20, 22; Pl.'s Ex. 1.)

The Partnering Agreement states: "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflicts of law principles."[32] (Id. at Ex. 1 at Section 4(d); Pl.'s Ex. 1.) Accordingly, the Court will apply New York law here. To plead a breach of contract under New York law, "a plaintiff usually must allege that: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." 34-06 73, LLC v. Seneca Ins. Co., 198 N.E.3d 1282, 1287 (N.Y. 2022) (alteration in original) (citations omitted). In addition, the "plaintiff's allegations must identify the provisions of the contract that were breached." Id.

---

[31] James employs the general term "properties," which includes not just real estate, but also the automobiles listed in the Partnering Agreement. (Doc. No. 2-2, Ex. A ¶ 22.) However, importantly, James did not refer to the automobiles during the non-jury trial. Accordingly, the Court's analysis solely addresses the real estate underlying this dispute.

[32] See Xerox Corp. v. Bentley, 920 F. Supp. 2d 578, 579 (ED. Pa. 2013), in which the court noted:

In Semtek Int'l, Inc. v. Lockheed Martin Corp., 531 U.S. 497, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001), the Supreme Court explained that a federal court exercising diversity jurisdiction must adopt "the law that would be applied by state courts in the State in which the federal diversity court sits." Id. at 508, 121 S.Ct. 1021. This means that this Court must apply Pennsylvania choice of law rules.

Pennsylvania courts give effect to express choice of law provisions in contracts. See, e.g., Howard Savings Bank v. Cohen, 414 Pa. Super. 555, 607 A.2d 1077, 1078 (1992); Smith v. Commonwealth National Bank, 384 Pa. Super. 65, 557 A.2d 775, 777 (1989). See also Restatement (Second) of Conflict of Laws § 187(1) ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied").

      a.  James Has Proven by a Preponderance of the Evidence
           that a Contract Exists

The first step in this analysis requires a determination of whether a contract exists. "To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound . . . ." Kasowitz, Benson, Torres & Friedman, LLP v. Reade, 950 N.Y.S.2d 8, 9 (N.Y. App. Div. 2012) (internal quotation marks and citation omitted). Here, the Partnering Agreement provides: "[n]ow, therefore, in consideration of the premises and the mutual promises and covenants herein contained and intending to be legally bound, the parties hereto agree as follows . . . ." (Doc. No. 2-2, Ex. 1 at 1; Pl.'s Ex. 1.) On August 1, 2003, the parties signed the Partnering Agreement. (Doc. No. 2-2, Ex. 1 at 4; Pl.'s Ex. 1.) Accordingly, James has proven by a preponderance of the evidence that the Partnering Agreement was a contract that existed between the parties. However, his breach of contract claim fails on the third element because he has not proven that Johanna breached the Partnering Agreement.

      b.  James Has Not Proven by a Preponderance of the Evidence
           that Johanna Breached Her Contractual Obligations

The third element of a breach of contract claim requires a plaintiff to prove that the defendant breached his or her contractual obligations. James has not established by a preponderance of the evidence here that Johanna breached the "Partnering Obligation[s]" of the Partnering Agreement. The critical terms of the Partnering Agreement are found in subsections 2(a) to (k). They are set forth at length because James does not specify which provision was violated by Johanna. Instead, he makes general allegations that Johanna: (1) "unreasonably encumbered and/or lost" the properties; (2) acted "in contravention of the Partnering Agreement;" and (3) "failed and refused to provide annual financial statements, tax returns or other financial

information regarding the operations of the properties and automobiles governed by the Partnering Agreement." (Doc. No. 2-2, Ex. A ¶¶ 20-22.)

The Partnering Agreement contains eleven "Partnering Obligation[s]." (See Doc. No. 2-2, Ex. 1 at Section 2(a) to (k); Pl.'s Ex. 1.) These obligations are copied in full above in the Background section of this Opinion, supra Section II.B.1, and are once again provided:

(a) Each Principal hereby agrees, that each Property has been acquired to generate an economic benefit for both Principals, and that economic benefit shall be shared jointly, and distributed promptly to the individual Principals when realized.

(b) It is the intent of the Principals to share any Profit from the sale of a Property, or any appreciation of value in a Property, to JM Francis and to J ML Francis pursuant to the Percentages contained on Schedule A. Profit is defined as the net amount received after payment of sales costs, mortgages, or loans, and repayment of the initial capital and advances (collectively, "Initial Capital") contributed or made by either Principal, directly or indirectly, for the purchase of the Property.

(c) At least quarterly there shall be an accounting and preparation of reports detailing all financial transactions in connection with Property subject to this Agreement, and either party has the right to review documents related to the underlying transactions presented in said quarterly financial reports.

(d) During the period when a Property has been acquired or owned by an individual Principal in their name only, or through a wholly owned company of that individual, the individual Principal shall be entitled to deduct all tax losses and depreciation (collectively, "Losses") without attributing a pro-rata share of Losses to the other Principal.

(e) If sold to a third party during the period described in 2(d) the Profit split shall be as described in 2(b).

(f) Upon the sale of a Property each Principal or their controlled entity will receive any funds advanced as Initial Capital, either directly or indirectly, to initially acquire the Property. Said funds are not considered a distribution of Profit.

(g) If the Property is contributed to an entity ("Ownership Entity") in which beneficial ownership, either directly or indirectly, is held by each Principal, then appreciation in value shall be split as described in 2(b), and their capital accounts shall so reflect this division to the entity(ies) owned or controlled by JM Francis and to the entity(ies) owned or controlled by J ML Francis, pursuant

to the Percentages contained on Schedule A.  In such case the Initial Capital shall be noted as part of the records of the Ownership Entity and repaid to the Principals upon wind down and final distributions of the Ownership Entity prior to the Distribution of profit derived from the operations of the Ownership Entity.

(h)   Any distribution of Profit or repayment of Initial Capital due a Principal because of a sale of Property, or wind down and final distributions of the Ownership Entity shall hereafter be called a Required Distribution and shall promptly be paid to the individual Principals when realized.

(i)   If any Required Distribution is not promptly paid by the individual Principal who has control of it, the Principal failing to make such payment ("Defaulting Principal") agrees that the amount thereof shall bear interest at the rate of three percent (3%) above the "national prime" interest rate published from time to time in The Wall Street Journal ("Interest").  Interest shall be non-compounding and accrue immediately on the Required Distribution amount not paid by the Defaulting Principal, and shall be immediately due and payable to the non Defaulting Principal solely from funds of the Defaulting Principal and not from funds held for the mutual benefit of the Principals.

(j)   Property can be added to this list from time to time, by mutual agreement. Additionally, either Principal may elect, by giving Notice to the other Principal, that certain property acquired by the other Principal be considered Property as defined under this agreement because the Principal acquiring the Property is a Defaulting Principal as defined in 2(h), each Principal's interest in the newly acquired Property, shall be 50%.  If the Defaulting Principal objects the matter must go to arbitration.

(k)   Each Principal hereby agrees to promptly execute any document that is required to evidence this Agreement if such document is required by a third party, taxing authority or other governmental agency to clarify or substantiate the understanding contained in this Agreement.

(Id.)  The most relevant provisions for his claim of breach of the Partnering Agreement by Johanna are subsections (a) to (d).

To begin, James has not shown by a preponderance of the evidence that there was any economic benefit that Johanna failed to distribute under subsection (a).  Rather, there is no proof that there were any financial benefits.  (See Doc. No. 153 at 46:15-17.)  Instead, there were just losses or encumbrances.  In fact, all of the Philadelphia Properties were foreclosed or sold, except

for 232 S. 3rd Street, which was never developed.  (Doc. No. 148 at 135:20-136:3; Doc. No. 149 at 7:6; 38:16-23; 74:12-24; Doc. No. 151 at 43:7-9; Doc. No. 152 at 139:15-20; Doc. No. 153 at 14:24-15:1; 47:25-48:6; Pl.'s Ex. 118.)

James specifically asserts that Johanna "unreasonably encumbered and/or lost" the properties. [33]  (Doc. No. 2-2, Ex. A ¶ 20.)  He then states that it is "other properties held subject to the Partnering Agreement"[34] that have been impacted by Johanna's alleged breach.  (Id.)  There are two sets of properties covered by the Partnering Agreement listed in the attachments.  The first attachment, dated January 7, 2005, lists the following: (1) 718, 719, 720, 722, and 724 South 2nd Street (the "Queen's Mews South Properties"); (2) 207 and 209 Monroe Street (the "Queen's Mews West Properties"); and (3) 232 S. 3rd Street.  (Id. at Ex. 1 at 5.)  The second attachment, dated June 30, 2006, lists 724 South 2nd Street, 232 S. 3rd Street, and 179 Duane Street.[35]  (Id. at 6.)  The evidence does not show that it was Johanna's actions that caused these properties to be "unreasonably encumbered" or "lost."

---

[33]  The full allegation reads:

By and through the misconduct of Defendant, other properties held subject to the Partnering Agreement have been unreasonably encumbered and/or lost, such that Plaintiff has been deprived of the benefit of his ownership interest and the benefit of his initial capital contributions of the various assets set forth above in breach of the Partnering Agreement.

(Doc. No. 2-2, Ex. A ¶ 20.)

[34]  It is not clear whether "other properties" refers to all of the Philadelphia Properties or only those listed in the attachments to the Partnering Agreement.  James testified that: "the [S]chedule A in these documents change from year to year.  And they change as a result of what has been acquired and what is under development."  (Doc. No. 148 at 36:9-12.)  Further, he explained that the attachment dated June 30, 2006 included less properties because "some of these properties were contributed to a limited partnership."  (Doc. No. 148 at 37:4-5.)

[35]  The Duane Street property is not at issue in this case.

To start, because the Queen's Mews South Properties and the Queen's Mews West Properties were combined into a single project, they will be addressed together. James has not shown by a preponderance of the evidence that Johanna "unreasonably encumbered" or "lost" the Queen's Mews Properties. First, these properties initially experienced trouble when James stopped construction, prompting the lenders to file confessions of judgments. (Doc. No. 148 at 83:22-84:2; 116:21-23; Doc. No. 149 at 31:21-23; Doc. No. 152 at 109:6.) While Johanna initially helped to secure advances for the construction projects, she was not involved in the construction process, nor did she supervise the use of the funds. (Doc. No. 152 at 95:21-96:1; 114: 10, 23-25; 125:21-25.) As the construction project languished, Johanna self-funded the projects. (Doc. No. 152 at 95:21-22; 114:2-4, 7-9; 116:17-23; 138:2-5; 140:22-25; 141:1-3.) Second, James then removed Johanna as a general partner in 2010 and executed an Amended and Restated Limited Partnership Agreement for the Queen's Mews Properties, effectively taking control of them. (Doc. No. 149 at 161:23-25; Doc. No. 153 at 40:9.) Third, James filed a bankruptcy petition for Queen's Mews South LP and Queen's Mews West LP despite testifying that TD Bank, the lender, did not want to negotiate, but instead wished to pursue a foreclosure. (Doc. No. 149 at 77:24-25; 78:1-6; Doc. No. 153 at 126:7-15; Def.'s Ex. 252.) The properties were then sold "by way of a sheriff sale." (Doc. No. 153 at 14:24-15:1; 48:3-6.)

Next, James also has not shown by a preponderance of the evidence that Johanna either "unreasonably encumbered" or "lost" 232 S. 3rd Street. First, Johanna funded her down payment through a loan, which she has routinely paid since the purchase of the property. (Doc. No. 148 at 49:18-24; Doc. No. 153 at 7:3-8; 8:1-15; 17:22-25; 19:5-20; 22:16-20; 27:9-12; 30:22-23.) And after Citibank initiated foreclosure proceedings, Johanna reached an agreement with Citibank, and she continues to make payments on the loan. (Doc. No. 153 at 8:1-15; 16:21-25.) Second, the

evidence shows that 232 S. 3rd Street has not been lost, but instead is still owned by Johanna.  (Id. at 7:15-18; 30:22-23.)

Thus, James has not proven by a preponderance of the evidence that Johanna's actions "unreasonably encumbered" the properties or led to their loss or that she violated subsection 2(a) of the Partnering Agreement.

In addition, James has not proven by a preponderance of the evidence that Johanna breached subsection (b) of the Partnering Agreement.  This section of the Partnering Agreement requires the parties to jointly share profits or appreciation of value derived from the properties. However, once again, all of the Philadelphia Properties, except for 232 S. 3rd Street, were lost to foreclosure or sheriff's sale, and no profits stemmed from the properties.  Accordingly, there were no profits to share under subsection (b), and because 232 S. 3rd Street has not been sold, there is no evidence of appreciation of value either.   Consequently, James has not proven by a preponderance of the evidence that Johanna breached subsection (b) of the Partnering Agreement.

James also has not proven by a preponderance of the evidence that Johanna failed to grant him access to financial documents in violation of subsection (c) of the Partnering Agreement.[36] Instead, he testified to the contrary.  First, James stated that surplus funds from refinancing the New York Properties were applied to the Philadelphia projects, including to his own company, and that he spoke with Johanna directly about the payment of the bills.  (Doc. No. 150 at 146:22-25; Doc. No. 152 at 21:11-25; 22:1-5, 13-15.)   Second, he testified that Johanna forwarded him documents after he requested them.  (Doc. No. 150 at 66:15-25; 67:1-4.)  Third, James noted at

---

[36]   While James alleges in his Complaint that Johanna failed to provide financial documents for the automobiles as well, James did not mention the automobiles during his testimony. Accordingly, he has not proven this element of his claim by a preponderance of the evidence, and the Court will analyze only his claim as it relates to the properties.

trial that the parties stored records in their Brooklyn office, which he accessed to copy records. (Doc. No. 147 at 112:19-113:4; Doc. No. 148 at 121:5-10; 122:1-9, 13-15.)  Fourth, James worked with Jerome Lutnick in preparing the tax returns, and to facilitate this process, he renamed his Quickbooks files to "JMF," his initials.   (Doc. No. 152 at 142:2-3;  177:20-23, 25; 178 :1.) Fifth, James assisted Lutnick with preparing balance sheets. (Id. at 70:18-20.) Lastly, multiple times during trial, the parties referenced James's ability to access documents or Johanna providing documents to him.  (Doc. No. 148 at 131: 8-18; Doc. No. 150 at 15:6-9; 47:2-4; 66:15-67:4; 140:2-8; 147:1-7; Doc. No. 152 at 9:9-11; 146:4-8; 176:23-24; 177:1-7, 11-19; 178:2-6; 186:1-10; Doc. No. 153 at 38:11-20.; Def.'s Ex. 108)

Finally, under subsection (d) of the Partnering Agreement, Johanna was permitted to acquire the properties and therefore was entitled to deduct all tax losses and deprecation without attributing a pro-rata share of the losses to James.  Therefore, James has not shown by a preponderance of the evidence that she breached this subsection of the Partnering Agreement.

Thus, James has not proven by a preponderance of the evidence that Johanna breached the Partnering Agreement.  Because James has not proven by a preponderance of the evidence that Johanna breached the Partnering Agreement, the second and fourth elements of a breach of contract claim need not be addressed.

**3.  James Has Not Proven by a Preponderance of the Evidence that Johanna Committed Waste and Mismanagement of the New York Properties or the Philadelphia Properties**

a.  Waste and Mismanagement – New York Properties

James asserts that Johanna "engaged in waste and mismanagement."[37]  (Doc. No. 2-2, Ex. A ¶ 25.)

As noted, a claim for corporate waste and mismanagement is defined under Pennsylvania law as: "a blatant squandering of assets to the detriment of the business entity, as if the sole purpose was to harm the entity and render what little might be left to the remaining shareholders worthless." Simms v. Exeter Architectural Prods., Inc., 868 F. Supp. 668, 673 (M.D. Pa. 1994).  Importantly, waste must "be something more than a decision adverse to petitioner, or a business decision that proves to be risky or ultimately unsuccessful."  Id.

---

[37]  This analysis prompts the applicability of the laws of two states: New York and Pennsylvania. When a choice of law issue is presented, a court must first "determine whether a true conflict exists . . . .  According to conflicts of law principles, where the laws of two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice of law question."  See Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006) (citations omitted).

Under New York law, a claim for waste and mismanagement of assets "occurs when assets are used in a manner 'so far opposed to the true interests [of the corporation so] as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests.'"  United States Small Bus. Admin. v. Feinsod, 347 F. Supp. 3d 147, 166 (E.D. N.Y. 2018) (citation omitted).  Corporate waste in particular "is the diversion of corporate assets for improper or unnecessary purposes."  In re Firestar Diamond, Inc., 634 B.R. 265, 305 (S.D.N.Y. 2021) (internal quotation marks and citations omitted).

Under Pennsylvania law, waste and mismanagement of corporate assets is defined as "a blatant squandering of assets to the detriment of the business entity, as if the sole purpose was to harm the entity and render what little might be left to the remaining shareholders worthless."  Simms v. Exeter Architectural Prods., Inc., 868 F. Supp. 668, 673 (M.D. Pa. 1994).

These definitions, although stated differently, are highly similar and therefore would "produce the same result on the particular issue presented."  Accordingly, the Court will apply Pennsylvania law.

Here, James's allegation of waste and mismanagement as alleged in Count III of the Complaint focuses on three primary matters: (1) that the process used by Johanna to obtain a 90% interest in the New York Properties and subsequently creating Etienne Estates on Greene LLC and Etienne Estates at Washington LLC effectively "divert[ed] and convert[ed] Plaintiff's assignor's, Francis Family Investments LLC's, interest to and for her own benefit"; (2) Johanna "committed waste, mismanagement, and self-dealing with respect to the entities' assets including, inter alia, allowing the mortgages to go into default, living rent free . . . and causing the funds of both to be used for her purposes"; and (3) Johanna did not provide any of Etienne Estates on Greene LLC's or Etienne Estates at Washington LLC's business documents to James.  (Doc. No. 2-2, Ex. A ¶¶ 30-35.)  The evidence elicited at the non-jury trial, however, shows that James did not prove by a preponderance of the evidence that Johanna "blatantly squandered" the New York Properties' assets with the intention of damaging the properties or their related entities.

First, regarding his initial allegation, James did not prove by a preponderance of the evidence that Johanna committed waste and mismanagement through the transferring of interests or the creation of the two LLCs.  Moreover, James has also not proven by a preponderance of the evidence that Johanna used the transfers and creation of the two LLCs to benefit herself.  By contrast, (1) the 90/10% ownership structure in Etienne Estates New York was required by Washington Mutual, the lender (Doc. No. 152 at 157:9-23); (2) James was the person who created the operating agreements for Etienne Estates at Washington LLC and Etienne Estates on Greene LLC and so acknowledged at trial that he knew of their creation (Doc. No. 147 at 118:8-15; 120: 4-23; Doc. No. 152 at 149:10-20; 154:21-22; 156:10-13; Def.'s Ex. 39); (3) he created the instruments of transfer to achieve the 90/10% split (Doc. No. 152 at 155:10-12; 156:4-13); (4) he also recognized the tax implications of structuring the deal this way (Id. at 165:4-14; 166:5-23;

Def.'s Ex. 52); and finally (5) he sent an email to the title company containing the operating agreements, which again showed the 90/10% ownership structure. (Doc. No. 150 at 135:19-136:7; 162:3-20, 25; 163:1-2; Def.'s Ex. 51.)

Second, James has not proven by a preponderance of the evidence that Johanna committed waste and mismanagement by "allowing the mortgages to go into default, living rent free in a number of the units in Etienne Estates at Washington LLC and causing the funds of both to be used for her purposes." (Doc. No. 2-2, Ex. A ¶ 34.)

The evidence does not show that Johanna allowed the mortgages to go into default. The initial foreclosure and receivership proceedings pertaining to 301 Washington and 61 Greene resulted from James's own financial difficulties with the properties, which occurred before Johanna was involved with their management and which prompted James to seek Johanna's help. (Doc. No. 151 at 49:15-50:2, 9-12; 51:2-8, 11-16; 52:6-9, 15-24; 53:14-54:19; 116:14-25; 117:1; 122:1-13; Def.'s Ex. 1.) Johanna then (1) oversaw the New York Properties during these foreclosure and receivership proceedings; (2) initiated and facilitated several refinances to secure better terms; (3) paid to refinance the debt; and (4) personally guaranteed the loans. (Doc. No. 147 at 70:2-7; 148:19-22; 149:20; 154:2-5, 19-20; Doc. No. 151 at 126:1-2; 128:12-17, 25; 129:1-2; Doc. No. 152 at 11:1-3; 17:23-25; 18:1-5; 30:7-10; 32:8-9, 14-15.) Moreover, while the 61 Greene property experienced a second foreclosure, (Doc. No. 153 at 37:2-5), it stemmed from a lack of funds that was the result of James's failure to pay rent. (Doc. No. 152 at 132:14-23.) Johanna defended the property during these proceedings, reached an agreement with the lender, and is current on the loan. (Doc. No. 153 at 43:6-8, 24-25; 44: 1-3, 10-11; 45: 10-14.) In addition, Johanna filed a Chapter 11 Bankruptcy Petition "to protect 301 Washington from a threatened receivership by the mortgage lender," First Central Savings Bank. (Id. at 101:20-102:14, 24-25;

103:1-6.)  Johanna spent years handling the reorganization and paid the corresponding fees.  (<u>Id.</u> at 102:21-22; 107:21-108:7; 115:2-4.)  Accordingly, James has not shown by a preponderance of the evidence that Johanna allowed the mortgages to go into default, and that her actions rose to the level of a "blatant squandering" of assets.

Furthermore, the evidence does not support the claim that Johanna resided at 301 Washington rent-free.  In 2000, Johanna resided at 301 Washington and paid rent.  (Doc. No. 151 at 55:2-3; 117:2-3, 10.)  When she temporarily did not pay rent, it was because her father, James, either permitted her to live there rent-free or paid her wages in the form of waiving her rent payments while she was working for him.  (<u>Id.</u> at 54:19-24; 113:7-10.)  Again, James has not shown by a preponderance of the evidence that she lived there rent-free, and therefore cannot show that she engaged in waste and mismanagement in this respect.

The evidence also does not prove that Johanna used the funds of the New York Properties for her personal benefit.  Rather, a significant portion of the refinancing disbursements were directed to the Philadelphia Properties and to James's companies, and currently, Johanna does not receive a salary for her management of 61 Greene or 301 Washington.  (Doc. No. 150 at 81:9, 13-19; Doc. No. 152 at 15:6-8; Doc. No. 153 at 50:9-13; 51:23-25.)  Further, 61 Greene, while producing a small profit in the past, often receives financial support from Johanna, for it typically generates just enough income to cover its expenses.  (Doc. No. 153 at 45:15-18.)  Additionally, while 301 Washington generates some income, Johanna "pay[s] $12-to $15,000 a month to sustain that [the mortgage]."  (<u>Id.</u> at 51:18-20.)  Consequently, James has not proven by a preponderance of the evidence that Johanna "blatantly squandered" the assets of the New York Properties.

Lastly, James has not proven by a preponderance of the evidence that Johanna committed waste and mismanagement by failing to provide him with the business documents of Etienne

Estates on Greene LLC and Etienne Estates at Washington LLC.  James had access to the books and records, was sent copies of the books and records, and that she "produced about 100 boxes of records which were brought to Philadelphia for James to review."  (Doc. No. 152 at 9:9-11; 146:4-8; 176:23-24; 177:1-7, 11-19; 178:2-6; 185:16-17, 19-20; 186:1-10; Doc. No. 153 at 38:11-20; Def.'s Ex. 108.)  Furthermore, James testified that he had access to the records stored in their Brooklyn office.  (Doc. No. 147 at 112:19-113:4; Doc. No. 148 at 121:5-10.)  And, even if Johanna had failed to provide business documents, this conduct, without more, is not a form of corporate waste and mismanagement.  It is not the equivalent of a "blatant squandering of assets."

Accordingly, James has not proven by a preponderance of the evidence that Johanna engaged in waste or mismanagement of the New York Properties.

b.  <u>Waste and Mismanagement – Philadelphia Properties</u>

James also asserts a claim for waste and mismanagement of the Philadelphia Properties in Count V.  (Doc. No. 2-2, Ex. A ¶¶ 43-53.)  Specifically, he alleges:

a.  In her role as General Partner, Defendant engaged in waste, mismanagement and self-dealing causing ONT [Olde North Third][38] to default on a loan made to it by TD Bank NA resulting in a Judgment by Confession being filed against the ONT Property, and ultimately, a sheriff sale of the property was scheduled.

. . .

b.  Plaintiff, when recently preparing to file tax returns beginning with the year of 2009 which has been neglected by Defendant, discovered that approximately $125,000 was misappropriated by Defendant and/or the affiliate companies she controlled.

. . .

c.  As with her management of the other properties set forth in this Complaint, she engaged in waste, mismanagement and self-dealing causing these entities

---

[38]  The ONT Properties are located at 115 and 117 North Third Street.

[Queen's Mews South LP and Queen's Mews West LP][39] to default on loans made to them by TD Bank NA. As a result, a Judgment by Confession was filed and ultimately, the properties were sold at Sheriff's sale.

. . .

d. Throughout the time Defendant acted as the General Partner of ONT and the Queen[']s Mews LPs, she has failed and refused to provide Plaintiff with annual financial statements, tax returns or other financial information preventing him from being aware of the full extent of his damages and loss for which an accounting is necessary.

(Id. ¶¶ 46, 48, 51, 53.)

Again, James has not proven by a preponderance of the evidence that Johanna engaged in waste or mismanagement of the Philadelphia Properties.

First, the evidence does not show that Johanna caused the TD Bank loan to go into default. James halted construction on Olde North Third in 2008, which resulted in lenders filing confessions of judgments. (Doc. No. 149 at 31:21-23.) Furthermore, Kendall Jones testified that in sending the default letter regarding the 2008 loan, the bank "didn't look at it as any specific person's actions or lack of actions." (Doc. No. 150 at 28:22-25; 29:1.) In 2012, James elected to borrow additional funds from TD Bank to complete construction. (Id. at 37:16-20; 38:1-7, 12-16, 19-24; 39:1-5, 12-18; Pl.'s Ex. 72.) James personally guaranteed this loan. (Doc. No. 150 at 39:19-21.) However, he was still unable to complete the construction on this project. (Id. at 40:2-7.) Further, James removed Johanna as a partner in 2010 and executed an Amended and Restated Limited Partnership Agreement for Olde North Third, which effectively gave James control over the entity. (Doc. No. 149 at 22:19-21; 23:2-9; 161:23-25; Doc. No. 150 at 33:11-14; Doc. No. 151

---

[39]   The Queen's Mews South Properties are located at 718, 720, 722, and 724 South 2nd Street. The Queen's Mews West Properties are located at 207 and 209 Monroe Street.

at 66:11-16; Doc. No. 153 at 40:9.)  Therefore, James has not proven by a preponderance of the evidence that Johanna's actions led to a default on the mortgage on this property.

Second, James states that Johanna misappropriated $125,000.  James does not explain how the funds were misappropriated, nor does he provide details as to the relevant transactions that resulted in this alleged misappropriation.[40]  Without more, James has not proven by a preponderance of the evidence that Johanna misappropriated $125,000.  However, Lutnick, who assisted the parties with their tax returns, did not remember being informed of missing funds. (Doc. No. 153 at 69:19-70:4.)  Accordingly, James has not proven by a preponderance of the evidence that Johanna misappropriated funds.

Third, the evidence also does not show that Johanna caused Queen's Mews South LP or Queen's Mews West LP to default on their TD Bank loan.  As discussed in the Breach of the Partnering Agreement section, supra at Section III.A.2.b, the decline of these properties began when James stopped construction on them, prompting the lenders to file confessions of judgments.  (Doc. No. 148 at 83:22-84:2; 116:21-23; Doc. No. 149 at 15:15-18; 31:21-23; Doc. No. 150 at 34:12-16; 109:6; Pl.'s Ex. 69; Pl.'s Ex. 113.)  James also kept changing development designs (Doc. No. 152 at 114:10-14; 116:20-117:1; 118:15-20) and failed to properly use the construction funds.  (Id. at 115:18-20.)  While Johanna initially helped to secure advances for the construction projects, she was not involved in the construction, nor did she supervise the use of the funds.  (Id. at 95:21-96:1; 114:10, 23-25; 125:21-25.)  As the construction project languished, Johanna then contributed her own funds to salvage the properties.  (Id. at 95:21-22; 114:2-4, 7-9;

---

[40] During trial, James testified that Johanna took funds from a construction loan and directed those to her own companies.  (Doc. No. 149 at 43:18-21.)  He claimed that this amount totaled $124, 087.  (Id. at 43:25.)  He later repeats this contention, stating that she took $124,000 out of Olde North Third.  (Doc. No. 150 at 60:15-17; 61:24-25.)

54

116:17-23; 138:2-5; 140:22-141:3.)   Second, James removed Johanna as a general partner in 2010, effectively taking control of the Queen's Mews Properties and eventually filing a bankruptcy petition for Queen's Mews South LP and Queen's Mews West LP knowing that TD Bank only wanted to foreclose, rather than negotiate.   (Doc. No. 149 at 23:13-18; 24:1-5, 12-13, 18-23; 77:24-78:6; 161:23-25; Doc. No. 151 at 66:11-16; Doc. No. 153 at 40:9; 126:7-15, 19-21.)

Finally, as stated previously, a mere alleged failure to provide business documents, without more, fails to show that one engaged in a "blatant squandering" of assets that injured a business entity.   Additionally, the evidence shows several instances in which James accessed records, was provided records, or assisted in the production of records.

In sum, James has not proven by a preponderance of the evidence that Johanna committed waste and mismanagement regarding the New York Properties or the Philadelphia Properties.

**C.      Johanna's Counterclaims**

**1.   Johanna Has Not Proven By a Preponderance of the Evidence that She is Entitled to Declaratory Judgment**

In her first counterclaim (Count I), Defendant Johanna Francis seeks a declaratory judgment regarding her management authority over the Philadelphia entities.   (Doc. No. ¶¶ 86-91.)   The Declaratory Judgment Act provides, in pertinent part, as follows:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a); see also Atlantic Mut. Ins. Co. v. Gula, 84 F. App'x 173, 174 (3d Cir.2003); State Auto Ins. Cos. v. Summy, 234 F.3d 131, 133 (3d Cir.2000).   The United States Supreme Court has interpreted the language in the Declaratory Judgment Act as providing a federal court with broad discretion to determine whether to hear a declaratory judgment action.   Wilton v. Seven Falls

Co., 515 U.S. 277, 286–87 (1995); see also Gula, 84 F. App'x at 174 ("[J]urisdiction conferred by this act is discretionary and district courts are 'under no compulsion to exercise it.'") (quoting Summy, 234 F.3d at 133).   A party seeking declaratory relief "must demonstrate an 'actual controversy' indicating imminent and inevitable litigation, and a direct, substantial and present interest." Buehl v. Beard, 54 A.3d 412, 419 (Pa. Commw. Ct. 2012), aff'd, 91 A.3d 100 (Pa. 2014).

Moreover, "[t]he Declaratory Judgment Act's phrase 'actual controversy' 'refers to the type of "Cases" and "Controversies" that are justiciable under Article III.'" Apotex, Inc. v. Cephalon, Inc., No. CIV.A.2:06-CV-2768, 2010 WL 678104, at *3 (E.D. Pa. Feb. 23, 2010) (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007)).   "If there is no case or controversy at issue, the Court does not have jurisdiction." Mills v. City of Philadelphia, No. CV 21-273, 2022 WL 4389518, at *5 (E.D. Pa. Sept. 22, 2022).   "The 'core' of the 'case-or-controversy requirement' is the 'triad of injury in fact, causation, and redressability.'" New Jersey Peace Action v. Obama, 379 F. App'x 217, 221 (3d Cir. 2010) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998)).   "[T]o meet the redressability requirement, a plaintiff must establish that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision,'" and "[t]his is true even when a plaintiff seeks a declaratory judgment." Id. at 221.

Johanna seeks an order declaring the following:

a. that Ms. Francis is, and at all times relevant to this action has been, the proper manager of Francis Family Investments LLC;

b. that Ms. Francis is, and at all times relevant to this action has been, the proper manager of FFamily Investment LP [LLC];

c. that Ms. Francis, through her entity EE Realty GP, LLC is, and at all times relevant to this action has been, the proper manager of Olde North Third, LP; Queen Mews South, LP, and Queen Mews West LP;

d. that Ms. Francis, through her entity EEH GP at TrisVanDivi Court, LLC is, and at all times relevant to this action has been, the proper manager of TrisVanDivi

Court, LP;

e. That all consents unlawfully executed by Mr. Francis on August 12, 2010 which purport to be signed by Evelyn Francis are null and void;

f. That any vote held or scheduled by Mr. Francis and any document executed by him which purported to change the Manager of Olde North Third, LP, Queen Mews South, LP, and Queen Mews West LP, or TrisVanDivi Court, LP is null and void;

g. That all unauthorized actions taken by Mr. Francis on behalf of Francis Family Investments LLC, FFamily Investment LP, TrisVanDivi Court, LP, Queen Mews South, LP, and Queen Mews West LP, and Olde North Third, LP are void or voidable by Ms. Francis;

h. And granting such other relief that the court deems just and proper.

(Doc. No. 8 ¶ 91.)

Here, Johanna is not entitled to declaratory judgment on any of the above items.  First, Johanna is not entitled to declaratory judgment on items (c), (d), (f) or (g) because there is no case or controversy for the Court to resolve.  The Philadelphia Properties managed by the entities listed in items (c), (d), (f) and (g) have been lost in foreclosure.  In items (c), (d), (f) and (g), Johanna seeks declaratory judgments regarding the management and control of the entities that owned the Philadelphia Properties, but because the properties in question are no longer part of their portfolios since they were lost in foreclosure, neither James nor Johanna has a direct, substantial, and present interest in them.  Thus, there is no actual controversy to resolve.

Furthermore, Johanna is not entitled to declaratory judgment on points (a) and (b) and (e) to (h) above.  First, Johanna is not entitled to a declaration that "at all times relevant to this action" she was the proper manager of Francis Family Investments LLC and FFamily Investment LP [LLC].  The evidence does not support a declaration this broad.  Second, Johanna is not entitled to declaratory judgment on item (e) regarding the lawfulness of James's procurement of Evelyn Francis's vote.  The evidence does not show that James improperly procured this vote.  Finally,

Johanna is not entitled to a declaration granting any other relief the Court deems just and proper because it is far too broad a request.  Moreover, because the Court is not granting relief to either party, there is no need to make any declarations.  Even if the Court made a declaration on these items in favor of Johanna, it would not change the outcome for her because the properties covered by her request for a declaration were lost in foreclosure.

Therefore, Johanna is not entitled to declaratory judgment on any of the items listed above.

### 2.   Johanna Has Not Proven by a Preponderance of the Evidence that James Engaged in Waste or Mismanagement of Property or Assets.[41]

Johanna alleges in her second counterclaim (Count II) that James engaged in waste and mismanagement of the Philadelphia Properties and Philadelphia partnership assets.  (Doc. No. 8 ¶¶ 92-98.)

Johanna alleges that James committed property waste by failing to complete renovation and construction, diverting resources intended for renovation for his personal use, and encumbering the property owned by Olde North Third with a mortgage of over $2,000,000.  (Id. ¶¶ 95-96.)  "To establish a cause of action for [property] waste, a plaintiff must prove: 'an act constituting waste, done by one legally in possession of the property, prejudicial to the estate or interest of another.'"  Conquest v. WMC Mortg. Corp., 247 F. Supp. 3d 618, 645 (E.D. Pa. 2017) (quoting Versatile Metals, Inc. v. Union Corp., No. 85-4085, 1985 WL 47, at *1 (E.D. Pa. Dec. 9, 1985)).  The acts complained of should be "material and substantial," and not "nominal or trivial . . . as tenants are permitted to make in the ordinary occupancy and use of the property."  See Smith v. Chappell, 25 Pa. Super. 81, 87 (1904).

---

[41]   Because it is unclear whether Defendant's claim refers to waste and mismanagement of entity assets or waste and mismanagement of physical property, the Court will address both.  (See Doc. No. 8 at 36-37.)

Here, Johanna has not proven by a preponderance of the evidence that James's actions constituted property waste. James did not complete construction of the Philadelphia Properties. (Doc. No. 148 at 80:7-10; 116: 15-17; Doc. No. 152 at 109: 6; 114:1-14; 118: 15-20.) However, the evidence does not show the condition of the properties when James's work ceased, the amount of work that was done, or the requisite details that would support a finding that James's failure to complete construction was so material and substantial as to constitute waste. Further, Johanna has not proven by a preponderance of the evidence that James's placing a mortgage on the properties was not permitted during occupancy and use of the property. Finally, the evidence does not show that James's mortgaging of the properties was not permitted during ordinary occupancy and use of the properties. Therefore, Johanna has not shown by a preponderance of the evidence that James committed property waste regarding the Philadelphia Properties.

Moreover, Johanna alleges the James engaged in waste of assets belonging to the Philadelphia entities. (Doc. No. 8 ¶¶ 94, 97.) The Philadelphia entities consist of both limited liability companies (LLCs) and limited partnerships (LPs). (Id. ¶ 93.) As noted earlier, in order to find that a waste of corporate or entity assets has occurred, "there has to be something more than a decision adverse to the petitioner, or a business decision that proves to be risky or ultimately unsuccessful." Simms, 868 F. Supp. at 673. "For there to be waste, there must be a blatant squandering of assets to the detriment of the business entity, as if the sole purpose were to harm the entity and render what little might be left to the remaining shareholders worthless." 13 Summ. Pa. Jur. 2d Business Relationships §11:24; White v. George, 66 Pa. D. & C.4th 129 (Com. Pl. 2004). The Third Circuit has treated claims of partnership waste similar to those of corporate waste. See Goldstein v. Roxborough Real Est., LLC, 741 F. App'x 143, 144 (3d Cir. 2018).

Here, Johanna has not proven by a preponderance of the evidence that James engaged in waste and mismanagement of the assets belonging to the Philadelphia entities.  There is no evidence that James "blatantly squandered" assets of the Philadelphia entities so that the sole purpose was to harm the entities.  While there may be evidence of poor business decisions, Johanna has not shown by a preponderance of the evidence that James's acts amounted to waste.

### 3.  Johanna Has Not Proven by a Preponderance of the Evidence that James Was Unjustly Enriched

Johanna alleges in her third counterclaim (Count III) that James was unjustly enriched by his self-dealing and by her investments in the Philadelphia Properties.  (Doc. No. 8 ¶¶ 99-101.)

To recover against James for unjust enrichment, Johanna must establish: "(1) a benefit conferred on the [plaintiff] by the [defendant]; (2) appreciation of such benefit by the [plaintiff]; and (3) acceptance and retention of such benefit under circumstances such that it would be inequitable for the [plaintiff] to retain the benefit without payment to the [defendant]."  EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 273 (3d Cir. 2010) (citing AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa. Super. Ct. 2001)).  "'To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for [him] to retain.'"  Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 180 (3d Cir. 2008) (quoting Torchia v. Torchia, 346 Pa. Super. 229, 499 A.2d 581, 582 (1985)).  "To determine if the doctrine applies, we focus on whether the enrichment of the defendant was unjust."  Kia v. Imaging Scis. Int'l, Inc., 735 F. Supp. 2d 256, 269 (E.D. Pa. 2010) (citing Stoeckinger v. Presidential Fin. Corp. of Del. Valley, 948 A.2d 828, 833 (Pa. Super. Ct. 2008)).  "However, a claim for unjust enrichment requires more than a showing that the defendant may have benefited in some way from the disputed conduct."  Sovereign Bank, 533 F.3d at 180-81 (citing Walter v. Magee–Womens Hosp., 876 A.2d 400, 407 (Pa. Super. 2005)).

In her counterclaims, she alleges James was unjustly enriched and "received numerous benefits" including:

a. Purported management authority over various Francis Family entities;

b. An unauthorized $2,000,000 mortgage relative to the Olde North Third properties;

c. The proceeds from a disguised sale and partition of the TrisVanDivi properties;

d. The uncompensated value of Ms. Francis's investments in and costs paid for the Philadelphia properties;

e. The diversion of funds for his own personal use in an amount that can only be determined by an accounting.

(Doc. No. 8 ¶ 100.)   First, Johanna has not shown James was unjustly enriched by gaining management authority over Francis Family entities.  The evidence shows that on August 24, 2010, James removed Johanna as the general partner of all Philadelphia Properties and Partnerships, placed himself as the general partner and the sole manager of Francis Family Investments LLC, and amended the Limited Partnership Agreements for TrisVanDivi (Doc. No. 149 at 25:4-6, 11-12; Pl.'s Ex. 135), Queen's Mews (Doc. No. 149 at 23:15-18, 22-23; 24:9-15; Pl.'s Ex. 114; Pl.'s Ex. 115), and Olde North Third (Doc. No. 149 at 22:18-23; Pl.'s Ex. 67) so that as the corporate representative, he could engage in transactions on behalf of these entities with third parties.  While acting in this capacity, James could enrich himself through transactions on behalf of the entities, but the evidence does not show that whatever he received as a result of his management of the Francis Family entities was unjust.

Second, Johanna has not shown that James was unjustly enriched at the expense of Johanna through a so-called unauthorized $2,000,000 mortgage relative to the Olde North Third Properties. The mortgage was funded by TD Bank and was personally guaranteed by James.  (Doc. No. 150 at 37:16-20; 38:1-7, 12-16, 19-24; 39:1-5, 15-25; 40:1; Pl.'s Ex. 72.)  The evidence does not

establish that the mortgage, an encumbrance (Doc. No. 150 at 40:2-11, 23-25; 41:1-5), was an unjust enrichment to James at Johanna's expense, especially since James was responsible to repay the loan. Therefore, Johanna has not shown that James was unjustly enriched by the mortgage placed on the Olde North Third Properties.

Third, Johanna has not shown that James was unjustly enriched from proceeds of a disguised sale and partition of the TrisVanDivi Property. The evidence shows that regarding James's October 2010 transaction as to the TrisVanDivi Property, the proceeds were paid to various entities, some of which were controlled by James. The money was used to save the Queen's Mews Properties from foreclosure, for property maintenance, to fund a loan to Olde North Third, and possibly for other reasons; James could not recall. (Doc. No. 149 at 163:18; 172:11-19, 25; 173:1-9.) The evidence also shows that proceeds from the 2014 sale of the TrisVanDivi Property were used to save Olde North Third or to save James's capital invested in Olde North Third and other projects. (Id. at 149:4-20.) Therefore, Johanna has not shown by a preponderance of the evidence that the funds from any transaction with respect to the TrisVanDivi Property unjustly enriched James.

Fourth, Johanna has not shown that James was unjustly enriched by the value of her investments in and costs paid for the Philadelphia Properties. No evidence shows that Johanna's contributions to the Philadelphia Properties enriched James personally. Moreover, James and Johanna were business partners for many years. The evidence does not show any benefit James may have received is solely derived from Johanna's investments.

Finally, Johanna has not shown James was enriched by his diversion of funds for his own personal use in an amount that can only be determined by an accounting. A preponderance of the

evidence does not prove that James diverted funds for his personal use.  Therefore, Johanna has

not shown by a preponderance of the evidence that James was unjustly enriched by diverting funds.

### 4.   Johanna Has Not Proven by a Preponderance of the Evidence that James Tortiously Interfered with Johanna's Business Relations

Johanna alleges in her fourth counterclaim (Count IV) that James tortiously interfered with

her business relations with the entities she managed.   (Doc. No. 8 ¶¶ 102-108.)   Under

Pennsylvania law, the elements of tortious interference with a business relationship are as follows:

> (1) the existence of a contractual relationship between the plaintiff and a third party;
>
> (2) purposeful action by the defendant, specifically intended to harm the contractual relationship;
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) damages to the plaintiff as a result of the defendant's conduct.

Acclaim Sys., Inc. v. Infosys, Ltd., 679 F. App'x 207, 210 (3d Cir. 2017) (quoting Burton v. Teleflex

Inc., 707 F.3d 417, 433 (3d Cir. 2013)).   "Pennsylvania state courts have applied the contractual

relation standard to business relation causes of action" and "it does not appear necessary that a

complaint for intentional interference with business relations actually alleges the existence of an

existing or prospective contract."   Harp v. Rahme, 984 F. Supp. 2d 398, 422 (E.D. Pa. 2013), aff'd

(Aug. 13, 2014) (emphasis in original).

Here, Johanna alleges in her counterclaims that James interfered with her business

relationships "with various entities including Francis Family Investments, Investment LP[42], Olde

North Third, the Queen['s] Mews Entities, and TrisVanDivi wherein she acted directly or indirectly

---

42   It is unclear which entity "Investment LP" refers to.

63

as manager" by "usurping her legitimate management authority over these entities."[43]  (Doc. No. 8 ¶¶ 103-104.)

Johanna has not proven by a preponderance of the evidence that James interfered with her business relationship with any third party.  In fact, Johanna does not allege as much in her counterclaims.  (Id. ¶¶ 102-108.)  The entities Johanna managed are not third parties.  They are entities in which she has an ownership interest and on whose behalf she acted on when she was authorized to do so.  Her removal as a general partner or manager does not rise to the level of interference with business being done by a third party.  And James's alleged interference with Johanna's authority over entities she managed is not interference with business relationships between Johanna and a third party.  Therefore, Johanna has not proven by a preponderance of the evidence that James interfered with her third party business relationship.

### 5.   Johanna Has Not Proven by a Preponderance of the Evidence that James Converted Her Property

Finally, Johanna alleges a counterclaim of conversion (Count V) against James.  (Id. ¶¶ 109-116.)  "To prove a claim for conversion under Pennsylvania law, a plaintiff must show (1) the deprivation of her right of property in or use or possession of a chattel or other interference therewith, (2) without her consent, and (3) without lawful justification."  Scott v. PNC Bank, Nat'l Ass'n, 785 F. App'x 916, 918 (3d Cir. 2019) (citing Pioneer Com. Funding Corp. v. Am. Fin. Mortg. Corp., 855 A.2d 818, 827 (Pa. 2004)).

Johanna alleges that James "held the Philadelphia Properties and the related proceeds for his own use and to the complete exclusion of Ms. Francis."  (Doc. No. 8 ¶ 111.)  In Pennsylvania,

---

[43]   Moreover, although Johanna asserts to the contrary, accounts and lawyers would not fall in the third party category because they act in a professional capacity on behalf of the entities and would still continue to do so regardless of who owns or operates the entities.

"real property cannot be the subject of an action for conversion."  Sterling v. Redevelopment Auth. of City of Phila., 836 F. Supp. 2d 251, 270 (E.D. Pa. 2011), aff'd, 511 F. App'x 225 (3d Cir. 2013) (further citations omitted).  The Philadelphia Properties are real property and for this reason cannot be converted.

Johanna further alleges that James converted proceeds sourced from the Philadelphia Properties, funds intended for construction and redevelopment of the Philadelphia Properties, funds from a mortgage placed on the Olde North Third Properties, and proceeds from a "disguised sale" of the TrisVanDivi Property.  (Doc. No. 8 ¶¶ 111-114.)  Under Pennsylvania law, "[m]oney may be the subject of conversion."  Binns v. Flaster Greenberg, P.C., 480 F. Supp. 2d 773, 781 (E.D. Pa. 2007).  "[H]owever the rights to this money must have originally belonged to the plaintiff."  Rahemtulla v. Hassam, 539 F. Supp. 2d 755, 777 (M.D. Pa. 2008); see also Wen v. Willis, 117 F. Supp. 3d 673, 684 (E.D. Pa. 2015) ("Money may be the subject of conversion only where the plaintiff had a property interest in the money at the time of the alleged conversion.").  Courts in the Third Circuit have held that "an LLC member 'has no interest in specific limited liability company property.'"  Wen, 117 F. Supp. 3d at 684.  Therefore, an LLC member does not have a property interest in the LLC's property such that they can bring a conversion claim.  See id.

Here, Johanna has not proven by a preponderance of the evidence that James converted any funds.  First, Johanna has not shown that any proceeds from the Philadelphia Properties were converted.  The evidence does not identify any proceeds from the Philadelphia Properties or funds intended for construction and redevelopment of the Philadelphia Properties that originally belonged to Johanna.  She points to no evidence that the money itself belonged to her personally.  Without this proof, Johanna has not established conversion.

Further, she has not proven by a preponderance of the evidence that James converted funds by placing a mortgage on the Olde North Third Properties.  There is no evidence that the funds James received through the mortgage ever belonged to Johanna.  Finally, Johanna has not shown by a preponderance of the evidence that James converted the proceeds of a "disguised sale" of the TrisVanDivi Property.  Again, there is no evidence that any funds received by James from the sale of the TrisVanDivi Property ever belonged to Johanna, nor does the evidence establish definitively how the proceeds were distributed.  (Doc. No. 149 at 63:19-24; 71:24-72:4.)  Therefore, Johanna has not proved by a preponderance of the evidence that James converted property or funds.

## IV.    CONCLUSION

For the foregoing reasons, on Plaintiff James Francis's claims in the Complaint (Doc. No. 2-2, Ex. A) alleging in Count I (Equitable Relief: Quiet Title to 232 S. 3rd Street), in Count II (Breach of the Partnering Agreement), in Count III (Waste and Mismanagement – New York Properties), and in Count V (Waste and Mismanagement – Philadelphia Properties), Judgment will be entered in favor of Defendant Johanna Francis and against Plaintiff James Francis on each of these four Counts.  On Defendant Johanna Francis's counterclaims (Doc. No. 8) alleging in Count I (Declaratory Judgment), in Count II (Waste and Mismanagement of the Philadelphia Properties and Philadelphia Partnership Assets), in Count III (Unjust Enrichment), in Count IV (Tortious Interference), and in Count V (Conversion), Judgment will be entered in favor of Plaintiff James Francis and against Defendant Johanna Francis on each of these five Counts.  Accordingly, neither Plaintiff James Francis nor Defendant Johanna Francis is entitled to any relief in this case.